[Cite as *In re M.W. Children*, 2019-Ohio-948.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: M/W CHILDREN.                  :          APPEAL NO. C-180623
                                                 TRIAL NO.  F15-2147X

                                      :

                                      :          *O P I N I O N.*


Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  March 20, 2019


*Roger Kirk,* for Appellant Mother,

*Raymond T. Faller,* Hamilton County Public Defender, and *Allison McWhorter,* Assistant Public Defender, Guardian ad Litem for Children,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patrick Stapp*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**ZAYAS, Judge.**

{¶1}   Mother appeals from the judgment of the Hamilton County Juvenile Court adopting the magistrate's decision and granting permanent custody of her three minor children, D.M., L.W., and L.M. (collectively "the children"), to the Hamilton County Department of Job and Family Services ("HCJFS"). Because the juvenile court erred in denying mother's request to testify, we reverse.

### I.   The Children Are Adjudicated Dependent

{¶2}   Mother gave birth to the children before reaching her 18th birthday. D.M. was born in 2014, L.W. in 2015, and L.M. in 2016. The children share the same father.

{¶3}   In September 2015, mother was 16 years old when her second child, L.W., was born prematurely. The child also tested positive for marijuana. Mother was unable to account for her older child D.M.'s whereabouts except to note that he was staying with an uncle. Thus HCJFS filed a motion for interim temporary custody and a complaint for temporary custody of D.M. and L.W. in the Hamilton County Juvenile Court. The magistrate granted interim custody of the children to HCJFS. She also appointed counsel for mother, counsel for father, and a guardian ad litem ("GAL") for the children.

{¶4}   Mother appeared at the January 8, 2016 adjudicatory hearing. Father did not. After hearing argument on stipulated facts surrounding L.W.'s birth and mother's not knowing the address of the uncle with whom D.M. was living, the magistrate found that clear and convincing evidence established that D.M. and L.W. were dependent. HCJFS was granted temporary custody over them. Mother did not appeal from these orders.

{¶5} HCJFS devoted resources to remediating the problems facing the children and to ensuring their ability to return to the care of their mother or father. Mother was provided with case management, supervised visitations, diagnostic assessments of function ("DAFs"), therapeutic services, and parenting education. Mother participated inconsistently in these services.

{¶6} Upon her birth in June 2016, L.M. was also placed in the interim custody of HCJFS. She was placed in care with her siblings. At an October 6, 2016 hearing, the magistrate found that the issues that had led to the children's removal from mother's care had not yet been remediated. L.M. was adjudicated dependent and ultimately she was committed to the temporary custody of HCJFS. Mother did not appeal from these orders.

{¶7} On January 9, 2017, a second magistrate granted HCJFS's first motion to extend temporary custody over the children. She also granted HCJFS temporary custody over L.M. On March 14, 2017, the magistrate found that mother had completed a DAF that recommended individual therapy, toxicology screenings, and parenting education at Beech Acres. On April 14, 2017, the magistrate granted a second and final extension of temporary custody.

## II. HCJFS's Motion for Permanent Custody

{¶8} On May 23, 2017, HCJFS ultimately moved to modify temporary custody to grant permanent custody of the children to HCJFS. On September 28, 2017, a third magistrate set a trial date for HCJFS's motion for permanent custody. Trial was scheduled for January 4 and 12, 2018.

{¶9} On the first day of trial, mother was in attendance with her counsel. The magistrate noted that discovery documents had only recently been distributed to

the parties and, with the agreement of all parties except the GAL, continued the matter. The magistrate set new trial dates of March 14 and 21, 2018.

{¶10} Eight days later, father's appointed counsel moved to withdraw. He had represented father in every court proceeding since September 2015. In his motion, counsel stated that father no longer wished to work with him. Following a January 30, 2018 hearing on the motion, the magistrate permitted counsel to withdraw. She noted that father was "considering" representing himself. Nonetheless, the magistrate advised father to contact the Hamilton County Public Defender's Office to arrange for a new attorney, and reminded him that trial dates had been set for HCJFS's permanent-custody motion.

{¶11} On March 6, 2018, eight days before the trial was scheduled to begin, father's newly retained counsel made her first appearance in the proceeding. Six days later, retained counsel also moved to withdraw. She stated that father now planned to represent himself. Counsel also informed the magistrate that she had told father that the custody trial was to commence on March 14.

{¶12} Mother and her counsel were present in court on the March 14, 2018 trial date. Father appeared without counsel. But contrary to his stated intention to proceed pro se, father now requested that counsel be appointed to represent him prior to the custody hearing. The magistrate, noting that father had "made steps" to obtain counsel through the public defender's office, continued the matter until counsel could be appointed and be ready for trial.

{¶13} One week later, new counsel was appointed to represent father. Father's third counsel was present when the magistrate reset the commencement of the trial for June 5, 2018. The second date of trial was ultimately set for June 22, 2018.

4

### III. The Custody Hearings

{¶14}  At the beginning of the June 5, 2018 custody hearing, the magistrate noted that neither father nor mother was present.  Mother's counsel stated that he had kept mother informed of the hearing dates.

> MOTHER'S COUNSEL:  I am surprised that mother is not here, because if the Court, and I think parties, will note that mother's come for pretty much every pretrial and every hearing for the most part, over the last several months.
>
> So, I then, when she wasn't present today, I attempted to call the numbers I had.  They seemed to be not in service.
>
> * * *
>
> I guess I would be here participating and hopefully she'll show up.

{¶15}  Father's counsel explained that he had had only limited contact with his client, and on that basis he sought a continuance of the proceedings.  The magistrate acknowledged counsel's effort to contact father and then denied his request for a continuance.  HCJFS indicated its readiness to proceed and the hearing began.

{¶16}  Two witnesses testified: the HCJFS caseworker who had worked on the case since January 2016, and the foster father caring for the children.  The caseworker testified at length and noted the various deficiencies in the mother's and father's abilities to parent the children.  Mother's counsel cross-examined the caseworker and highlighted inconsistencies or weaknesses in her testimony in regard to her knowledge of mother's efforts to complete the case services.  On recross-examination by mother's counsel, for example, the caseworker acknowledged that

mother had successfully completed parenting classes. Counsel asked her whether mother had been regularly attending individual therapy sessions.

> CASEWORKER: Yeah, she's been going.
>
> * * *
>
> I mean I've skimmed some of the reports, and I've seen that
> she's addressed some of the issues, her personal issues that she's
> dealing with.

{¶17} After the completion of the testimony, mother's counsel stated that he "certainly * * * was hoping to present testimony of mother." The magistrate added, "Okay. So that's for next time," and the hearing was continued in progress until June 22, 2018.

{¶18} At the June 22 hearing, mother and father again failed to appear. The magistrate inquired about mother's presence.

> MOTHER'S COUNSEL: I just spoke to her on the phone. She
> had called the Court. She reported that she had arranged for rides to
> be here, and neither one of them appeared.
>
> So she's in – her car is not working. So she's arranged or tried
> to arrange some type of transportation to come here. I know she's in
> Middletown she reports, so [she is] an hour away. I don't know.
>
> * * *
>
> And, apparently, she's with [father].

{¶19} The magistrate then ascertained from father's counsel that he had been unable to contact his client.

> MAGISTRATE: Okay. All right. Well, it is 11:22. We're
> scheduled to begin at 11:00, so let's begin.

{¶20} HCJFS rested. Mother's counsel informed the magistrate that he had intended to call his client.

> MOTHER'S COUNSEL: The Court hasn't officially said it, but it sounds like the Court is not inclined to wait any longer.

> MAGISTRATE: I'm not. The parents didn't appear without explanation to the Court anyway at the last setting, and then here we're now 23 minutes in, and I understand she has [a] snafu with a ride, but she's in Middletown, but she should have started this process a little sooner.

{¶21} At the conclusion of the June 22 proceeding, without objection, mother's counsel moved two exhibits into evidence as the entirety of mother's case. One was a May 22, 2017 certificate indicating that mother had completed the Beech Acres Parenting Center Parent Enrichment Services program. The other was a May 23, 2018 letter from mother's counselor at the Family Access to Integrated Recovery program. The counselor stated that mother had been diagnosed with persistent depressive disorder. Mother had completed 33 counseling sessions. She had attended sessions once a week for the previous four months. The counselor noted that mother's depression had "seemed to improve for some time."

{¶22} That same day, the magistrate issued a detailed written decision granting HCJFS's motion for permanent custody. The magistrate explained her ruling denying mother's request for a continuance by noting that HCJFS had "an issue maintaining contact with both parents." She described that issue as being reflected in mother's failure to appear at the first custody hearing, and in her failure to contact her counsel until after the second custody hearing had begun. The magistrate noted that at the commencement of the second hearing mother and father

were "some 50 miles away [in Middletown], and they had not yet obtained transportation."

{¶23} The magistrate found that HCJFS had established by clear and convincing evidence that the children could not and should not be placed with either parent within a reasonable time, *see* R.C. 2151.414(B)(1)(a), and that it was in their best interests to be placed in the permanent custody of HCJFS. *See* R.C. 2151.414(D)(1). The magistrate also noted that D.M. and L.W. has already been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d).

{¶24} The magistrate concluded that despite three years of reunification efforts by HCJFS, neither mother nor father had completed all the case-plan services. For example, father had been referred for over 20 toxicology screenings and had attended only one in which he tested positive for marijuana. The magistrate acknowledged that mother had completed a DAF, had engaged in therapy, and had completed all random toxicology tests without a positive screening, but noted that mother's progress had come largely near the end of the case.

### IV. The Juvenile Court Objections Hearing

{¶25} Mother filed timely amended objections in which she challenged the weight of the evidence adduced to support the magistrate's custody decision and the magistrate's ruling denying her request to appear at trial. On September 18, 2018, the juvenile court held a hearing on the objections. Mother was present with her counsel. Her counsel sought leave to permit mother to testify before the juvenile court as permitted under Juv.R. 40(D)(4)(b).

MOTHER'S COUNSEL: [A]t the end of the day, what we really are asking for is for the Court to permit [mother] to have her, so to speak, day in court.

* * *

When I contacted her [about missing the first trial date], it was my understanding she had the wrong date in her mind.

And the second one – there was some issue where her mother was going to pick her up and that kind of fell through.

But she called the court and I was able to talk to her – the magistrate knew that.

{¶26} Counsel informed the juvenile court of mother's good record of attending the pretrial hearings. He then reminded the court of the importance of permitting mother to testify.

MOTHER'S COUNSEL: [This hearing] is one of the most serious decisions this Court can make in some regards, about terminating parents' rights.

And it seems that to have the complete picture would be the most helpful for the Court [to] make that decision.

There were only two witnesses * * * at trial.

One of those was the caseworker and the other was the foster parent.

But what we are – would be presenting, and what the Court would need to know, is how [mother's] progress was regarding her case plan services to resolve the issues that came in.

When this case started -- [mother] was just 16 years old when she had these children. She's now 19.

One of the issues then was her level of maturity. The other issue was – I mean, there were case plan services put in place.

She had taken at least two diagnostic assessments. There were recommendations for individual therapy.

{¶27} Counsel then described the uncertainties in the caseworker's testimony regarding mother's progress in the case plan, particularly regarding her parenting skills and her progress in individual therapy.

Now, why this becomes important – because when you look at the transcript of the testimony of the caseworker * * * on two of the critical services, mom's parenting skills and also her progress with the therapy, the caseworker's ultimate response was, I don't know.

Whenever she was asked about the parenting, she says – you can see it in the transcript – Well you're going to ask her, meaning * * * the parenting supervisor for mom – what her progress was in fact.

And then as far as mom's progress in the individual therapy * * * the caseworker had no action reports. We had some dialogue in trial about, you know, she wanted to get reports, but somebody didn't show up or something like that.

*  *  *

But you have no testimony – certainly the foster parent wouldn't know anything about [mother's] services.

But the caseworker also on the critical issues was unable to produce any information in terms of what the level of progress was.

10

And that's why we're asking the Court to allow [mother] to have a chance to testify to the Court and present her perspective and give the Court a complete picture of what it was before and where she is now in terms of her ability to parent these children.

{¶28} HCJFS objected to mother's testifying, noting the passage of substantial time since the case had begun. HCJFS also argued that mother's earlier failures to take advantage of the case services were indicative of mother's behavior in general and that "this isn't a case where mother is doing everything she can in order to get her kids back." Mother's counsel reminded the court that mother had attended most of the previous hearings, and that she had not made a previous request for a continuance. He concluded by asking that mother have a "chance to show" that the children should be returned to her: "So we would ask the Court to allow mom to have that opportunity."

{¶29} The juvenile court then adjourned the objections hearing without permitting mother to testify and without offering an explanation for its ruling. In its judicial entry, journalized four weeks later, the juvenile court overruled mother's amended objections without comment beyond noting that the magistrate had properly determined "the objected matters."

{¶30} The juvenile court accepted the magistrate's decision, found that clear and convincing evidence established that the children could not and should not be placed with either parent within a reasonable time, and determined that it was in the best interests of the children to be committed to the permanent custody of HCJFS.

{¶31} Mother brought this appeal.

### V. The Denial of Mother's Opportunity to Testify

{¶32} In her first assignment of error, mother argues that the denial of her request to testify deprived her of the opportunity to rebut HCJFS's claims that the children could not be returned to her in a reasonable amount of time and that permanently terminating her rights to the children was in their best interests.

{¶33} Mother is a party to the permanent-custody proceeding. *See* Juv.R. 2(Y). And a party has a right "to a reasonable opportunity to be present at trial[.]" *Brown v. Bowers*, 1st Dist. Hamilton No. C-070797, 2008-Ohio-4114, ¶ 15. That right is particularly important at a trial determining whether to terminate a parent's permanent rights to her children. *See In re J.W.*, 9th Dist. Summit No. 24924, 2009-Ohio-6957, ¶ 19. But a party's right to testify must be balanced against a trial court's ability to manage its docket so as to perform its work efficiently and diligently. *See In re E.A.*, 1st Dist. Hamilton No. C-130041, 2014-Ohio-280, ¶ 8.

{¶34} Here the interests that the juvenile court was required to balance are of the greatest consequence. The juvenile court has a strong interest in the timely resolution of permanent-custody motions and in the "speedy resolution" of the children's custody. *In re W.W.*, 1st Dist. Hamilton No. C-110363, 2011-Ohio-4912, ¶ 51; *see* R.C. 2151.414(A)(2). Those interests are opposed by mother's constitutionally protected interest in the care, custody, and control of her children. *See In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *see also Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (concluding that the federal constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"). That right is subject only to the

ultimate welfare of the children. *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶35} The parent-child bond is "extremely important and when the state attempts to permanently terminate the relationship between a parent and child, the parent 'must be afforded every procedural and substantive protection the law allows.'" *In re R.K.*, 152 Ohio St.3d 316, 2018-Ohio-23, 95 N.E.3d 394, ¶ 5, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Among the protections afforded to a parent is "a due process right to be present at permanent custody hearings." *In re J.W.*, 9th Dist. Summit No. 24924, 2009-Ohio-6957, at ¶ 19-20.

{¶36} This court will review whether the juvenile court's decision denying mother an opportunity to testify was unreasonable, arbitrary, or unconscionable in light of these competing considerations. *See In re E.A.*, 1st Dist. Hamilton No. C-130041, 2014-Ohio-280, at ¶ 5; *see also* Juv.R. 40(D)(4(b). To reach this determination, we review the entire record including the proceedings before the juvenile court at the September 18, 2018 objections hearing.

{¶37} Here, the evidence of record weighs in favor of reversal. First, mother had not previously requested a continuance. *See In re Edward M.*, 6th Dist. Lucas No. L-04-1282, 2005-Ohio-3354 (holding that the denial of father's motion to continue a permanent-custody trial was an abuse of discretion where father had never before asked for a continuance and had attended all other scheduled hearings); *see also Moore* at ¶ 7. We note that, unlike mother, father had previously requested several continuances while attempting to obtain counsel. Of the 152 days that the trial was delayed from its initial setting for January 4, 2018, until June 5, 2018, none were occasioned by mother's request for a continuance. We also note that of the 27

hearings held before the June custody hearings, mother had missed only two. Her last absence was on February 15, 2017, nearly 16 months previously.

{¶38} Indeed, mother appeared at the September 18, 2018 objections hearing and was ready to "testify to the Court and present her perspective * * * of her ability to parent these children" at that hearing. Under Juv.R. 40(D)(4)(b), in ruling on objections, a juvenile court may "take additional evidence, or return a matter to a magistrate." Mother's counsel was prepared for her to testify. HCJFS's counsel, father's counsel, and the GAL were present. They were prepared to, and did, argue at length regarding the limitations of mother's prospective testimony. In light of the gravity of the matter before it, the juvenile court's decision to permit mother to testify at the objections hearing could have conserved substantial judicial resources while causing little inconvenience to the parties or the court.

{¶39} Mother's counsel explained that she was unable to attend the custody hearings because of a lack of transportation. *Compare In re J.W.,* 9th Dist. Summit No. 24924, 2009-Ohio-6957, at ¶ 15 and 21 (parent was hospitalized for emergency surgery and could not attend a permanent-custody hearing). While arranging for transportation was a matter within mother's control, the record reflects that she had taken some steps to secure transportation. Mother's car was not working, and she had "arranged for rides" but "neither one" had appeared. At the objections hearing, counsel informed the juvenile court that mother had sought one of the rides from her mother.

{¶40} The other important factors relevant to the juvenile court's decision include the need to expeditiously resolve the custody of the children, and whether the custody of the children, and in particular a determination of their best interests, could be fairly made in the absence of mother's testimony. As the Ninth District

cogently framed the issue: "the goal of timely permanence is important in permanent custody cases. But so, too, is the goal of properly measuring whether the parent-child relationship should be maintained." *In re J.W.* at ¶ 22.

**{¶41}** Here, the 120-day statutory period to resolve HCJFS's motion for permanent custody had been significantly exceeded well before mother's request to testify. *See* R.C. 2151.414(A)(2); *see also In re J.E.*, 2017-Ohio-8272, 100 N.E.3d 151, at ¶ 16. Mother proposed to testify regarding her progress toward completion of her case services, her progress in individual therapy, her increased level of maturity at age 19, and her desire to remain a part of her children's lives—all factors regarding her ability to safely parent her children. While this testimony would not have rebutted the magistrate's findings that D.M. and L.W. had been in the temporary custody of HCJFS for more than 12 of the previous 22 months, it could have rebutted the finding that the children could not and should not have been returned to mother within a reasonable period, and, most importantly, it could have affected the juvenile court's determination of whether it was in the children's best interests to have their relationship with their natural mother permanently terminated.

**{¶42}** The children's best interests remain the ultimate focus of the juvenile court's inquiry. *See In re Cunningham*, 59 Ohio St.2d 100, 391 N.E.2d 1034, at syllabus; *see also In re Bailey*, 1st Dist. Hamilton No. C-040014, 2005-Ohio-3039, ¶ 23. And here mother's presence at trial was necessary to fairly determine the children's best interests. *See In re J.W.*, 9th Dist. Summit No. 24924, 2009-Ohio-6957, at ¶ 22.

**{¶43}** There are no mechanical tests for deciding when the juvenile court errs in denying a parent's request to testify. *See, e.g., In re E.A.*, 1st Dist. Hamilton No. C-130041, 2014-Ohio-280, at ¶ 29 and 31. Here, however, in light of the importance of

the parent-child bond, the short delay occasioned by mother's single request for a continuance, the necessity of mother's presence at the trial, and the ability of the juvenile court to easily remedy the harm by permitting mother to testify at the objections hearing, we hold that the court abused its discretion in overruling mother's objection without taking additional evidence.

{¶44}  The first assignment of error is sustained.

### VI. Moot Challenge to the Weight of the Evidence

{¶45}  In her second assignment of error, mother essentially challenges the weight of the evidence adduced to support the finding that it was in the best interests of the children to be placed in the permanent custody of HCJFS.

{¶46} Mother's manifest-weight-of-the-evidence assignment of error is rendered moot by our resolution of her first assignment of error and by our ultimate disposition of this appeal, and therefore, we do not address it.  *See* App.R. 12(A)(1)(c).

### VII.   Conclusion

{¶47}  Having sustained the first assignment of error, we reverse the juvenile court's judgment and remand the cause to the juvenile court for proceedings consistent with law and this opinion.

Judgment reversed and cause remanded.

**MOCK, P.J.,** and **MYERS, J.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

16