**[Cite as *In re S.D-M.*, 2014-Ohio-1501.]**

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: S.D-M.

C.A. Nos.    27148
                      27149

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 11-09-0616

DECISION AND JOURNAL ENTRY

Dated: April 9, 2014

BELFANCE, Presiding Judge.

{¶1}    Appellants, Ashley M. ("Mother") and Jeremy D. ("Father"), each appeal from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor child, S.D-M., and placed her in the permanent custody of Summit County Children Services ("CSB"). This Court reverses the judgment of the trial court and remands for further proceedings.

I.

{¶2}    Mother and Father are the unmarried parents of S.D-M., born September 12, 2011. At the time of S.D-M.'s birth, Mother had just turned fourteen years old and Father was seventeen. Mother was in foster care, having been removed from her own mother's home, along with her half-siblings, six months earlier upon concerns of dependency and neglect. Father lived with his grandmother who was his legal guardian. His own mother is deceased and his father's parental rights had been terminated.

{¶3} While the baby was still in the hospital, CSB filed a dependency complaint in juvenile court. The complaint noted that Mother was in foster care, and alleged concern with her general immaturity, poor hygiene, and lack of parenting skill. As to Father, the complaint noted that he was visiting the child in the hospital and that he needed to learn parenting skills. No other significant concerns were expressed. Upon agreement of the parties, the trial court granted emergency temporary custody of the baby to CSB. CSB placed the baby with Mother in her current foster home.

{¶4} In due course, the trial court adjudicated S.D-M. to be a dependent child and granted temporary custody of her to the agency. The court adopted a case plan that required both parents to maintain contact with the child; attend parenting classes to increase their parenting skills; and show that they can meet the daily needs of their daughter, including properly feeding, diapering, and changing her clothes. Mother was also required to complete a mental health assessment, take prescribed medications, and participate in counseling.

{¶5} While this case continued, the matter involving Mother's own custody was concluded with an order on April 18, 2013, terminating her legal relationship with her parents. Mother's half-siblings were placed in the legal custody of their father.

{¶6} CSB moved for permanent custody of S.D-M on May 17, 2013. Mother and Father each filed a motion for legal custody. Evidence was heard on these matters over the course of four days. On October 4, 2013, the trial court granted CSB's motion for permanent custody and denied both motions for legal custody. Mother appeals and assigns a single error for review. Father appeals and assigns two errors for review.

II.

MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT'S DENIAL OF [MOTHER'S] AND FATHER'S MOTIONS FOR LEGAL CUSTODY AND GRANTING OF SUMMIT COUNTY [CHILDREN] SERVICES' MOTION FOR PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS REVERSIBLE ERROR[.]

FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE MINOR CHILD'S BEST INTEREST THAT SHE BE PLACED IN THE PERMANENT CUSTODY OF SUMMIT COUNTY CHILDREN [SERVICES] AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7} Mother and Father each contend that the trial court erred in finding that permanent custody was in the best interest of the child because the weight of the evidence does not clearly and convincingly support that finding. For the reasons set forth below, we find merit in this argument.

{¶8} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶9} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); see *also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶10} Clear and convincing evidence is that which will "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Furthermore, in reviewing a challenge to the weight of the evidence, this Court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. *See In re M.C.,* 9th Dist. Summit No. 24797, 2009-Ohio-5544, ¶ 8 and ¶ 17. *See also Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶11} The trial court found that the first prong of the permanent custody test was satisfied because S.D-M. had been in temporary custody of CSB for at least 12 of the prior 22 months. Mother does not contest that finding, but rather challenges the second-prong finding that permanent custody is in the best interest of the child. Father also challenges the second-prong finding.

{¶12} The greater portion of case planning services and testimony in this case related to Mother. Several service providers were assigned to her or the baby: Erica Lewis-Starks was the protective case worker assigned to both Mother's case and S.D-M.'s case; Becky Crookston was Mother's therapist from Northeast Ohio Behavioral Health ("NEOBH"); Danielle Snyder was the foster care case manager; Jennifer Cranston was the permanency planning social worker; Tiffany Finley was the managing clinical supervisor from Children's Advantage in Ravenna; and Jacqueline Stringer was the guardian ad litem for S.D-M. All worked with Mother at various times during this proceeding and testified at the hearing. Mother was treated for postpartum depression by a medical doctor and was seen by three counselors for depression and an adjustment disorder, as well as to enhance parenting skills, regulate emotions more positively, improve academics, and make positive social decisions.

{¶13} Over the course of two years, Mother resided in eight separate placements, two of which were returns to previous placements. S.D-M. had three placements during the same period. Most of Mother's placement changes were due to conflicts between Mother and her foster parents, and some were due to efforts to implement joint placements of Mother and S.D-M. Mother and child resided together twice, for a total of approximately five months.

{¶14} There was evidence before the trial court that Mother and S.D-M shared a bond and that Mother demonstrated some positive interaction, but also that Mother did not always engage with the baby and occasionally needed to be prompted to provide needed care or attention. According to the foster care manager, Mother would respond to directions as if she understood them, but she did not always follow through to the anticipated results. At times, the foster parents felt Mother was overwhelmed with the responsibilities of school and child care. When the baby was placed separately from Mother, the foster parents reported that she made

little effort to check on her or schedule visits. Some service providers felt that Mother was uncertain if parenting was really what she wanted.

{¶15} Mother testified that she was initially hesitant about whether she could care for S.D-M. full time, but she now believes she can. She testified that she has learned to be more nurturing and a better care-giver through experiences gained in various foster homes. She also believes she now has a stronger bond with her daughter.

{¶16} As noted above, Father's case plan required him to maintain contact with S.D-M.; attend parenting classes to increase his parenting skills; and show that he can meet the daily needs of his child, including properly feeding, diapering, and changing her clothes. Father completed a parenting course, maintained employment for a year and a half, and maintained contact with his child. Testimony regarding his parenting skill and care of the child was positive. In addition, Father's housing arrangements were said to be acceptable. Father has consistently indicated that he would like to have legal custody of S.D-M. and raise her. He testified that he had a room, a crib, and plenty of toys for S.D-M.

{¶17} Over time, Father's visits proceeded very well. The caseworker, who observed more than 20 visits, testified that Father was very hands-on with S.D-M. She reported that he got down on the floor with her, played in the play-kitchen at the visitation center with her, played with bubbles with her, and ran and played on the playground with her. He bottle-fed her in the past and fed her appropriately as a two-year-old. He voluntarily changed her diaper, although he occasionally forgot to change her diaper at the end of visits. The caseworker reported no concerns about his ability to discipline S.D-M. She testified that Father responded well to taking directions, and that he demonstrated that he has the ability to parent. The CSB permanency planning social worker similarly described his interaction as "attentive" and "engaged."

{¶18} The guardian ad litem observed four or five visits at Father's residence and the same number of visits in other settings. She testified that Father has "a wonderful relationship" with his daughter. She described his approach as "very caring and kind." She stated that S.D-M. reacts to him because he has "tremendous interpersonal skills." In sum, she reported that the visits with Father were "very positive."

{¶19} Ms. Snyder, the foster care case manager, described Father's interaction with his daughter as "wonderful." She observed a particular visit at the home of Father's aunt, where Father was staying at the time. She stated that the baby went straight to Father and they did well together. Father was able to calm her when needed, and he got down on the floor to play with her. She reported that the home of Father's aunt seemed fine, and noted that the aunt was willing to assist Father with the child. Ms. Snyder said that the child was calm and content at the end of the visit. The witness indicated that she had received no negative reports about Father's interactions with S.D-M.

{¶20} Father testified on his own behalf about playing with his daughter in the back yard, changing diapers, feeding her, and maintaining her sleep schedule. He testified that his visits with his daughter "mean the world to me. Just to get to see her [is] a blessing." When the child's foster parent sent a developmental journal to a visit, Father was happy to learn that he was familiar with some of the baby's favorite songs and that the foster mother had packed her Christmas dress because he wanted to take her to see Santa and take pictures. Father had plans to obtain a medical card and food stamps for the child. He also anticipated using day care during his work hours.

{¶21} Father's visits progressed to the point of having four-hour unsupervised visits at his residence. The caseworker made unannounced visits and found that Father had appropriate

activities planned. Overnight visits were anticipated to begin soon. The guardian ad litem explained that Father "was certainly exhibiting behavior that we thought would be wonderful. He would be great. We were really looking to see what could we give and how could we support [him] in every way possible to be [S.D-M.'s] father on a full-time basis."

{¶22} At that point, with unsupervised visits going well and overnight visits about to begin, Father apparently told the caseworker that he occasionally used marijuana to help him sleep and to deal with stress from his job at a fast food restaurant. He later testified that he never used marijuana around S.D-M. The caseworker reported that, upon hearing this, she asked him to stop using the drug and told him that he would have to do drug screens. She said that she told Father that S.D-M. could not come to his home and he could not have unsupervised visits until the test results were negative. She also suggested that Father participate in Fame Fathers, a support program for fathers who are raising children.

{¶23} Following this discussion, Father's case plan was not amended to include a requirement of drug screens or attendance in the Fame Father's program. Ultimately, Father's case plan was never so amended, nor was such an amendment ever presented to or adopted by the trial court. Father did not perform the drug screens and did not participate in Fame Fathers.

{¶24} At the permanent custody hearing, Father testified that he did not believe his case plan included drug screens or the Fame Fathers program. He also stated that he never used marijuana around S.D-M. This Court has previously held that evidence of marijuana use by a parent may be a relevant consideration in a permanent custody case where the case plan addresses substance abuse, however "the conduct of a parent is relevant * * * solely insofar as that parent's conduct forms a part of the environment of this child." *In re A.A.*, 9th Dist. Summit No. 24817, 2009-Ohio-5884, ¶ 44, quoting *In re Burrell*, 58 Ohio St.2d 37, 39 (1979). *See also*

*In re R.S.,* 9th Dist. No. 21177, 2003-Ohio-1594, ¶ 13 (holding that absent evidence of a detrimental impact upon the child, a parent's marijuana use does not warrant the state in removing a child from the parent's custody). There was no evidence in the record that Father's care of his child was affected by marijuana use, nor was there any evidence that Father ever used marijuana while caring for S.D-M.

{¶25} Notwithstanding, it is apparent from the record that the failure to comply with this purported component of his case plan was viewed by the service providers as a major stumbling block to any efforts to place S.D-M. with Father. In light of the facts in this case and our legal precedents, we find it significant that drug screens and participation in the Fame Fathers program were never added to Father's case plan, nor were they otherwise made an order of the trial court. Because these matters were not added to Father's case plan and were not otherwise made an order of the trial court, Father was not and should not be bound by them as comprising his case plan.

{¶26} The procedures for the creation and amendment of a case plan are statutorily mandated. *See* R.C. 2151.412. Because the journalized case plan binds "[a]ll parties," the terms of the case plan bind not only the parents, but also the state. *See* R.C. 2151.412(F)(1). The procedures in R.C. 2151.412 establish that a caseworker may not independently create an initial case plan, nor may a caseworker alone amend a parent's case plan by merely telling the parent to complete extra tasks. *See* R.C. 2151.412(F)(2). Rather, the process of creating a case plan is begun when the agency files a proposed case plan with the trial court. R.C. 2151.412(D). It is only after the trial court approves the case plan or determines the contents of the case plan following the taking of evidence, that the trial court journalizes the case plan as part of the

dispositional order for the child and it becomes binding on the parties. R.C. 2151.412(E) and (F)(1).

{¶27} The statute further provides that any party may propose changes to a substantive part of the case plan. The additional requirements of drug screens and attendance at a support group are substantive matters and are therefore, subject to "the mandatory procedure" set out in R.C. 2151.412. *See In re Townsend*, 4th Dist. Athens No. 04CA46, 2005-Ohio-2473, ¶ 30. We recognize that some changes may, in the absence of objections, be implemented by the agency without formal adoption and journalization by the trial court. R.C. 2151.412(F)(2)(b). Notwithstanding the foregoing, it is critical to note that the statute mandates that the moving party must first file any proposed changes with the trial court and must also provide written notice of proposed changes to all parties. R.C. 2151.412(F)(2). The parties then have the statutory right to object and request a hearing on the proposed change. *Id.* In such a case, "[t]he agency shall not implement the proposed change unless it is approved by the court." R.C. 2151.412(F)(2)(a). Absent written notice to the court and to the parties of proposed changes, any such proposal will lack the force of a court order and, as well, the parents are deprived of the due process right to notice. *See In re Bennett*, 9th Dist. Summit No. 19366, 1999 WL 1037752, *3 (Nov. 10, 1999).

{¶28} Even emergency amendments, generated to prevent immediate or threatened harm, which may be implemented immediately by the agency, require the agency to notify the court and all parties by the next day and, in addition, require the agency to file a statement of the proposed change with the trial court within three days and give written notice of the proposed change to all parties. R.C. 2151.412(F)(3). In addition, the resulting case plan is to be journalized by the trial court. R.C. 2151.412(F)(3)(a) and (b). *See also* Ohio Adm.Code 5101:2-

38-05. Accordingly, mere statements by a caseworker to a parent, even under the guise of requirements, are not sufficient to amend a case plan and create a binding obligation under the statute. Caseworkers do not have such authority. The initial creation of a binding case plan and the implementation of substantive changes to a case plan lie solely within the province of the trial judge.

{¶29} The creation and substance of a case plan is critical because it is the primary reunification tool of children services agencies as contemplated by Chapter 2151. It is no less important where, as here, a trial court relies on R.C. 2151.414(B)(1)(d), the "12 of 22" factor, in support of permanent custody. In such cases, the Ohio Supreme Court has emphasized that the statute anticipates that parents will have those 12 months "to demonstrate their ability and fitness to care for their child * * *." *In re C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 25. Otherwise, the process "interferes with the protection of parental rights afforded by the legislature." *Id.* This period of time is designed to allow for the implementation of the case plan and guide the parents towards reunification.

{¶30} Here, the record demonstrates that CSB did not file a proposal for a routine change, nor did CSB file a statement in support of an emergency change in regard to either drug screens or the Fame Fathers program. Additionally, the trial court did not journalize an amended case plan that included these matters. Thus, drug screening and participation in the Fame Fathers program were never part of Father's case plan.

{¶31} Despite the foregoing, it is clear from the testimony and the nature of the questions posed to the witnesses that the CSB caseworker, the CSB attorney, and the guardian ad litem were under the mistaken impression that drug screening was part of Father's case plan. It is also clear that the guardian ad litem based her recommendation that permanent custody be

awarded to CSB in large part upon Father's non-compliance with the drug screening that was never part of his case plan. In light of the foregoing, it is understandable that the trial court likewise would have believed that drug screening was part of Father's case plan. In fact, it is evident that the trial court relied upon it being a part of the case plan and found Father's non-compliance important in concluding that granting permanent custody to CSB was in S.D-M.'s best interest. While the trial court found that S.D-M. was bonded to Father, and that Father was attentive to her needs and very engaging in their visits, the trial judge found that Father lacked the maturity and ability to parent S.D-M. In doing so, the trial court stated that "Father has not done what is necessary to be ready for custody" and specifically cited his failure to complete drug screens. The trial judge was also concerned about the mental health issues that might be implicated by Father's use of marijuana.

{¶32} Considering all the evidence discussed above and the fact that Father's failure to undergo drug screening should not have negatively weighed against him, we cannot conclude that there was clear and convincing evidence presented demonstrating that permanent custody with CSB was in S.D-M.'s best interest. Instead, when the evidence presented under the actual case plan is considered, much of it weighs in Father's favor. The record demonstrates that Father had a positive relationship and very good interaction with his child. *See* R.C. 2151.414(D)(1)(a). In fact, aside from the concerns related to Father's self-admitted occasional marijuana use, all parties involved had a positive opinion of Father's interactions and relationship with S.D-M. With respect to the wishes of S.D-M., as expressed by the guardian ad litem, we note that the guardian ad litem's recommendation was skewed as a result of her reliance on erroneous facts. *See* R.C. 2151.414(D)(1)(b). It is unclear what her recommendation would be if she had known that drug screening was not part of Father's case plan. As to the factor of custodial history, it is

very possible that if Father's use of marijuana and any related mental health matters had been properly included in his case plan, perhaps Father would have been assessed and assisted by professionals more promptly and appropriately thereby allowing him to rectify any issues that would hinder extended unsupervised visitation with S.D-M. *See* R.C. 2151.414(D)(1)(c). This is significant because, absent Father's admission of marijuana use, there is no complaint regarding Father's conduct or interaction with his child such that substance abuse or mental health concerns were implicated. Finally, the evidence validly adduced at the hearing below does not clearly and convincingly demonstrate that permanent custody is the only means by which to provide a legally secure permanent placement for this child. *See* R.C. 2151.414(D)(1)(d).

{¶33} We offer no opinion as to whether the parental rights of S.D-M.'s parents should be preserved. The termination of those rights is an alternative of last resort, and the parents have no burden to prove that their rights should not be terminated. *See In re Wise* 96 Ohio App.3d 619, 624 (9th Dist.1994). Under the circumstances presented in this case, we cannot conclude that CSB demonstrated by clear and convincing evidence that the termination of parental rights was warranted. *See* R.C. 2151.414(D). Consequently, we conclude that the trial court erred in terminating the parents' parental rights and in placing S.D-M. in the permanent custody of CSB. Mother's sole assignment of error is sustained. Father's second assignment of error is sustained.

FATHER'S ASSIGNMENT OF ERROR I

OHIO REVISED CODE § 2151.414(B)(1)(d) IS UNCONSTITUTIONAL AS IT IMPOSED A STATUTORY PRESUMPTION OF PARENTAL UNFITNESS OF [FATHER] IN VIOLATION OF THE SUBSTANTIVE AND DUE PROCESS RIGHTS OF [FATHER] AS GUARANTEED UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶34} In his remaining assignment of error, Father claims that R.C. 2151.414(B)(1)(d), the so-called 12-of-22 provision, is unconstitutional because it presumes parental unfitness once the child is in the custody of a children services agency for more than 12 months of a consecutive 22-month period. Given our resolution of Mother's sole assignment of error and Father's second assignment of error, it is not necessary to consider the constitutionality of R.C. 2151.414(B)(1)(d). This assignment of error is rendered moot, and is, therefore, overruled. *See* App.R. 12(A)(1)(c).

### III.

{¶35} Mother's sole assignment of error and Father's second assignment of error are sustained. Father's first assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

EVE V. BELFANCE
FOR THE COURT

CARR, J.
MOORE, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant Mother.

JASON D. WALLACE, Attorney at Law, for Appellant Father.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

LINDA BENNETT, Guardian Ad Litem.