[Cite as *In re D.M.*, 2020-Ohio-3273.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: D.M., L.W., and L.M. | : | APPEAL NO. C-200043 |
| | | TRIAL NO. F15-2147X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: June 10, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patrick Stapp,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Allison McWhorter*, Assistant Public Defender, for Appellee Guardian ad Litem for D.M., L.M. and L.W.,

*Cynthia Daugherty*, for Appellant Mother.

**ZAYAS, Judge.**

{¶1} Appellant F.W. ("Mother"), appeals from the judgment of the Hamilton County Juvenile Court that terminated her parental rights to her three minor children, D.M., L.W., and L.M., and placed the children in the permanent custody of the Hamilton County Department of Job and Family Services ("HCJFS"). We reverse the juvenile court's judgment and remand the cause for further proceedings.

### I. Facts and Procedural History

{¶2} This case is about the custody of three young children born to two young parents. D.M was born on August 4, 2014, L.W. was born on July 5, 2015, and L.M. born June 2, 2016. Mother was 15 when she had her first child, and the children's father, D.M., ("Father") was 16.

{¶3} On September 10, 2015, HCJFS filed a complaint and motion for an interim order of custody for L.W. and D.M., claiming that the parents were not able to adequately provide care or protect the health and well-being of the children. In support, the agency alleged that L.W., who was born premature at 26 weeks, tested positive for marijuana at birth, and that while Mother was in the hospital with L.W., she was unable to account for the whereabouts of her older child, D.M., except to state that he was staying with an uncle. L.W. remained in the NICU at Cincinnati Children's Hospital at the time of the agency's filing. The motion was amended to include Mother, as Mother was also a minor.

{¶4} The motion was granted, and a case plan was entered regarding D.M. and L.W. on November 6, 2015. The case plan required Mother to participate in a diagnostic assessment to determine whether there was "the need for intervention specific to mental health deficits, cognitive deficits and use of controlled substances."

The agency was concerned that Mother may have had issues beyond immaturity. Mother was also required to participate in random urine screens scheduled by HCJFS and was permitted weekly visitation with her children.

{¶5} Following a hearing, D.M. and L.W. were adjudicated dependent on January 12, 2016. The magistrate's dependency finding was based on the allegations in HCJFS's initial complaint. An allegation of neglect was dismissed. Neither parent appealed this adjudication.

{¶6} On June 2, 2016, L.M. was born. HCJFS filed a motion for temporary custody of L.M., alleging that Mother had not received any prenatal care until her 30th week and that Mother had not made much progress on the case plan with respect to D.M. and L.W. The magistrate granted the motion, noting that Mother was still a minor and her mother, T.W., ("maternal grandmother") was not present at the hospital, had her phone turned off, and had not spoken to her 17-year-old daughter for several days.

{¶7} On August 8, 2016, a Semiannual Administrative Review ("SAR") indicated that Mother had completed the required diagnostic assessment of function and was recommended for individual therapy. Mother was referred to St. Joseph Orphanage for therapy services and was paired with a parenting coach at Beech Acres Parenting Center ("Beech Acres"). Mother participated in eight random urine screens, all of which were negative.

{¶8} On September 22, 2016, the court held a hearing pursuant to *In re Young Children*, 76 Ohio St.3d 632, 669 N.E.2d 1140 (1996), regarding the court's continuing jurisdiction over the case once the statutory time had expired for the extension of temporary custody under R.C. 2151.415. The court found that it did have continuing jurisdiction to make dispositional orders in the best interest of the

3

children, as the "situation from which they originally needed protection" had not been resolved. *See In re Young Children* at 638.

{¶9} On October 6, 2016, the magistrate granted HCJFS's motion to extend temporary custody of all three children, remarking that "all of the issues that led to the children being removed from the mother's care and custody have not been alleviated. Mother has three children and will turn 18 [on October 11]." The magistrate's entry also noted: "While mother did not test positive for marijuana when [L.M.] was born, and may not be using at this time, she previously tested positive for marijuana at the older two children's births when she was only 15 and 16 years of age." The magistrate questioned Mother's maturity level, her parenting abilities, and her ability to adequately provide a safe and secure environment for three children while still not quite an adult. Questions also remained about her relationship with Father, and the magistrate was concerned about the lack of information regarding maternal grandmother's ability to provide a safe and secure home for Mother and her children based on HCJFS's reporting that maternal grandmother had a history of substantiated abuse to her own children.

{¶10} On November 15, 2016, L.M. was adjudicated dependent. This finding was based on the testimony of HCJFS case manager Juliana Moxley, medical records confirming limited prenatal care, and evidence that Mother tested positive for marijuana in April of 2016. Neither parent appealed this adjudication.

{¶11} On February 14, 2017, a case plan was entered for all three children. This plan noted that neither parent was fully engaging in the case-plan services, and that HCJFS did not approve of maternal grandmother's "relative home study." (Maternal grandmother had filed for custody of the children, whereupon a home study for placement was initiated by HCJFS.) According to the case plan, "the

conditions for return are [Mother] must demonstrate appropriate parenting skills and knowledge to meet their developmental and medical needs. The parents must demonstrate substance sobriety. [Mother] must demonstrate mental health stability and compliance. [Mother] must obtain appropriate parenting skills and knowledge."

{¶12} On March 14, 2017, the magistrate again extended temporary custody. In her entry, the magistrate noted that HCJFS was providing the following services to make it possible for the children to return home: (a) therapeutic foster care placement (by placing the siblings together), (b) parenting education for both Father and Mother, (c) supervised visitation for both parents, (d) individual counseling for Mother, and (e) random toxicology screens for both parents.

{¶13} On May 4, 2017, HCJFS moved for permanent custody for all three children. The agency alleged that the children cannot and should not be placed with either of the parents because the parents have failed continuously and repeatedly to remedy the conditions causing the children to be placed outside the home, the parents have demonstrated a lack of commitment toward the children, and "[t]here has not been sufficient progress through case plan services to return the children home to a safe and stable environment."

{¶14} The July 19, 2017 SAR indicated that Mother had completed a diagnostic assessment, was diagnosed with persistent depressive disorder, and was attending weekly therapy. The SAR also noted that Mother had completed parenting education classes through Beech Acres and received a certificate of completion in May of 2017. Additionally, because Mother had completed randomized drug screens and tested negative, concerns for substance abuse were thereafter removed from the case plan. The review noted that "some progress" had been made towards addressing the concerns regarding placement of the children.

5

{¶15} After several continuances (at Father's request), a permanent-custody trial took place before a magistrate in June of 2018. There were two days of testimony. Mother was scheduled to testify during the second day of testimony. She was unable to attend due to transportation issues, and her counsel requested a continuance, which was denied. The hearing proceeded in Mother's absence. The magistrate granted HCJFS's motion for permanent custody, finding that D.M. and L.W. had been in the custody of HCJFS for 12 or more months of a consecutive 22-month period, that L.M. could not be placed with either parent within a reasonable time or should not be placed with them, and that permanent custody to HCJFS was in all of the children's best interest.

{¶16} Mother filed objections to the magistrate's decision, and personally appeared to defend her objections and testify. However, the juvenile court affirmed the magistrate's decision without taking testimony.

{¶17} Mother appealed the juvenile court's judgment, and on March 20, 2019 we reversed the judgment and remanded the cause, holding that the juvenile court erred in denying mother's request to testify at trial. *See In re M/W*, 1st Dist. Hamilton No. C-180623, 2019-Ohio-948.

{¶18} Upon remand, Mother's counsel requested that she be allowed to resume visitation with her children. The reversal effectively reinstated the case to before permanent custody was granted, at which time Mother had weekly visitation with her children. *See id.*; *In re G.N.*, 176 Ohio App.3d 236, 2008-Ohio-1796, 891 N.E.2d 816, ¶ 12 (12th Dist.). Despite this, and the court indicating that it would take up the issue at the next hearing, the court never permitted Mother to resume visitation.

**{¶19}** On August 13, 2019, Mother was able to testify and present additional evidence to rebut HCJFS's motion to modify temporary custody to permanent custody. Following her cross-examination, Mother read to the magistrate a statement that she prepared describing the steps she had taken throughout the case for the return of her children. Shortly thereafter, the magistrate committed all three children to the permanent custody of HCJFS. The juvenile court affirmed the magistrate's decision over Mother's objections. Mother now appeals.

## II. Analysis

**{¶20}** In her sole assignment of error, Mother argues that the juvenile court erred by granting HCJFS's motion for permanent custody. Mother contends that the judgment is not supported by sufficient evidence and is against weight of the evidence. In her supporting argument, Mother argues that she completed her case plan and remedied the conditions that caused her children to be removed, and that HCJFS's evidence to support permanent custody was sparse, incomplete, and outdated.

### A. Standards of Review

**{¶21}** In a review of permanent-custody cases "we will not substitute our judgment for the trial court where some competent and credible evidence supports the essential elements of the case." *In re A.B.*, 1st Dist. Hamilton No. C-150307, 2015-Ohio-3247, ¶ 14, quoting *In re M.R.*, 1st Dist. Hamilton No. C-130401, 2013-Ohio-4460, ¶ 5. "Our review for sufficiency asks whether some evidence exists on each element. It is a test of adequacy, and whether the evidence is sufficient to sustain the judgment is a question of law." *Id.* at ¶ 15. Our review of the weight of the evidence "asks whether the evidence on each element satisfies the burden of persuasion, which in this case was a clear and convincing standard." *Id.*

7

**{¶22}** "Clear and convincing evidence is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re W.W.*, 1st Dist. Hamilton No. C-110363, 2011-Ohio-4912, ¶ 46. "[W]e weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re A.B.* at ¶ 16, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517; *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). However, we must be mindful of the presumption in favor of the finder of fact. *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

### B. Permanent Custody

**{¶23}** R.C. 2151.414(B)(1) establishes a two-pronged test for courts to apply when determining whether to grant a motion for permanent custody to a public children services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) permanent custody is in the best interest of the child under R.C. 2151.414(D)(1)(a)-(e). *See* R.C. 2151.414(B)(1).

### 1. First Prong—R.C. 2151.414(B)

**{¶24}** The juvenile court determined, and the record confirms, that the first prong of the permanent-custody test was satisfied as to D.M. and L.W., because the children were in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period.

{¶25} As to L.M., the juvenile court found that she could not be returned to Mother within a reasonable time or should not be returned to her care. *See* R.C. 2151.414(B)(1)(a). In making this determination, the court found, under R.C. 2151.414(E)(1), that Mother failed to remedy the conditions that caused L.M. to be placed outside the home. Consequently, we must review the record to determine whether HCJFS established by clear and convincing evidence that, despite reasonable case-planning efforts, Mother failed to substantially remedy the conditions that caused the child's initial and ongoing removal.

### Reasons for Removal

{¶26} The reasons for L.M.'s initial removal from her Mother's care are those set forth in the adjudicatory decision. *See In re M.P.*, 2015-Ohio-4417, 46 N.E.3d 221, ¶ 17 (9th Dist.). Here, the removal of L.M. was predicated on the lack of progress on the case plan that Mother had for the return of D.M. and L.W. Some evidence also went towards Mother's living situation at the time and her relationship with maternal grandmother, as Mother was still a minor when L.M. was born and living with maternal grandmother, who by all accounts was an absent parent.

{¶27} The court reasoned that as L.M. was "brand new and at risk of serious harm if she does not receive proper care" and because Mother made only limited progress on the case plan with respect to D.M. and L.W., it was in L.M.'s best interest to be placed in the temporary custody of HCJFS. At the time the court granted temporary custody of L.M. to HCJFS, Mother had missed a urine screen, had not completed therapy or parent-coaching sessions, and did not seem to be engaged in parenting classes according to Beech Acres. There was no evidence before the juvenile court to establish that L.M. had been removed from Mother's care or

continued to be placed outside the home because of abuse or neglect. The juvenile court only adjudicated L.M. dependent.

{¶28} Because L.M.'s removal was tied to the case plan involving her siblings, we begin our analysis there. D.M. and L.W. were initially committed to the temporary custody of HCJFS because L.W. was born prematurely and tested positive for marijuana in her system, and because Mother was unable to account for the whereabouts of D.M., except to state that he was staying with an uncle. Thereafter, the court issued the following orders to Mother as part of the plan to reunify her with her children: complete a diagnostic assessment, engage in individual therapy, participate in random toxicology screens, complete parenting education, and attend regular visitation.

*Diagnostic Assessment, Therapy and Drug Screens*

{¶29} As mentioned above, the record shows that Mother completed a diagnostic assessment and was diagnosed with persistent depressive disorder in April 0f 2017. Mother testified at trial that she had completed an updated diagnostic assessment and submitted a letter from her therapist confirming her attendance at 33 sessions over the past year. Mother said that therapy was beneficial to her, and that she only stopped attending when her assigned therapist left the organization sponsoring the services. Mother had also participated in random toxicology screens and was negative for all substances, so this requirement was removed from the case plan as of July of 2017.

*Parenting Education*

{¶30} Mother completed parenting education classes and received a certificate of completion in May of 2017. HCJFS case manager Juliana Moxley testified at trial when asked, "of the case plan services that you have referred to,

starting with Mother, how many of those case plan services has Mother completed? And by completed, I mean met the requirements stated in the case plan," Moxley answered, "One, the parenting." Despite the certificate and Moxley's testimony, the juvenile court faults Mother for failing to complete a "parenting coaching" component of parenting education. However, the record does not reflect that the case plan required such a component. The magistrate's decision merely notes that Mother "was recommended for parenting coaching via Beech Acres." A recommendation is not sufficient to become a requirement under the statutory provision for case plans.

{¶31} The procedures for the creation and amendment of a case plan are statutorily mandated. *See* R.C. 2151.412; *In re S.D-M.*, 9th Dist. Summit No. 27148, 2014-Ohio-1501, ¶ 26. R.C. 2151.412(F)(1) provides that "[a]ll parties, including the parents, guardian, or custodian of the child, are bound by the terms of the journalized case plan. A party that fails to comply with the terms of the journalized case plan may be held in contempt of court." "Any party may propose a change to a substantive part of the case plan," but the "party proposing a change to the case plan shall file the proposed change with the court and give notice of the proposed change in writing before the end of the day after the day of filing it to all parties and the child's guardian ad litem"—at which point any party can request a hearing on the proposed change within seven days. R.C. 2151.412(F)(2).

{¶32} In Mother's case plan for her children, she is described as needing "parenting skills," and the magistrate's initial order adopting the case plan describes the requirement as "parenting education." While Dawn Merritt of Beech Acres testified that parenting education services "entails parenting classes, parent coaching, and parent liaison services for all of the families that were referred," again,

11

the court characterized "parenting coaching" as a recommendation and never journalized it as a requirement. Journalization is key, as it means written notice of the proposed changes were provided to the parties, in keeping with a parent's due-process right to notice. *See In re S.D-M.* at ¶ 27.

{¶33} However, even while parenting coaching was a recommendation, Mother participated in the service. Merritt testified that Mother met with two different parent liaisons a number of times and participated in parent coaching while at the Family Nurturing Center. Mother likewise testified to her interaction with parent liaisons and participation in parenting coaching, and also to her voluntary participation in most of the Fatherhood Project—a weekly parenting program sponsored by the Talbert House—wherein she and the children's father met with yet another parent liaison.

{¶34} Because the record does not contain any notice regarding an additional requirement of parenting coaching, and because Beech Acres could not have unilaterally amended Mother's case plan "by merely telling [her] to complete extra tasks," *see In re S.D-M.*, 9th Dist. Summit No. 27148, 2014-Ohio-1501, at ¶ 26, citing R.C. 2151.412(F)(2), we find that parenting coaching was not a requirement Mother had to fulfill. The agency could certainly have requested a change to the explicit requirements of the case plan, pursuant to R.C. 2151.412, as it did when it removed the condition that Mother participate in random drug screens, but it did not. Again, the determination of whether Mother completed the parenting-education component of the case plan was squarely addressed by the agency case manager in the affirmative. Therefore, the juvenile court's determination that mother failed to complete the parenting-education aspect of the case plan is not supported by clear and convincing evidence.

*Visitation*

**{¶35}** In addition to addressing parenting education, Mother was required to visit her children regularly to demonstrate her parenting skills. The magistrate's and juvenile court's decision states that Mother did not attend regular visitation, and when Mother did visit, she "struggled" to manage her children. The implication is that by visiting infrequently Mother had little opportunity to demonstrate that she could implement what she had learned through parenting education, and in fact failed to show that she could adequately parent her children. The record does not support these findings or the implication.

**{¶36}** HCJFS case manager Moxley testified at trial when asked "So it was your testimony that [Mother] did visit the children regularly until April [of 2018]?" answered, "Yes, she was visiting."

**{¶37}** In contrast, foster father testified when asked how many visits per month [Mother] had attended, "Over the past year. Let's see here. I'd say roughly maybe 60 percent of the visits. I'm not sure." Foster father later said that 60 percent was his estimate for Mother's visitation over the life of the case. His testimony appears to be the only basis for the magistrate's finding that Mother "attended approximately 60% of the supervised visits." Foster father had been the placement for all three children while they were in temporary custody and he and his wife hoped to adopt the children.

**{¶38}** HCJFS did not submit visitation records from the Family Nurturing Center. Mother acknowledged at trial that throughout the case she only discontinued visitation for around two months when she was in Michigan with the children's father.

13

**{¶39}** While we are mindful of the presumption in favor of the factfinder, we cannot ignore the disparity between the equivocating testimony of foster father and the clear testimony of the agency case manager. Testimony that Mother attended "roughly maybe 60 percent of the visits" coupled with "I'm not sure" does not establish with firm belief or conviction Mother's visitation schedule with her children. We also cannot ignore the fact that the case manager testified under the authority of HCJFS, which is statutorily responsible for preparing and maintaining the case plan, including visitation. *See* R.C. 2151.412(A).

**{¶40}** The magistrate's decision also indicated that Mother "struggled during her supervised [visitation] managing all three children," and noted that Merritt described Mother as looking "uncomfortable by herself" during the visits. However, Merritt's observation and evidence that Mother "struggled" with her children was dated and therefore hardly relevant. Merritt explained at trial that Mother looked uncomfortable managing three small children by herself, stating "you know how those small ones can be, and it was a lot of mom. It was a lot." But based on Merritt's own testimony her observations were years ago, at a location no longer used for family visitation. In any event, her observation is not especially revealing, as managing three young children is difficult for anyone, as Merritt testified.

**{¶41}** The most recent evidence in the record demonstrating that Mother "struggled" with all three children was from an email dated November of 2016, from the visitation facilitator at the Family Nurturing Center. HCJFS submitted the email as evidence at trial in June of 2018. The facilitator wrote:

> Some areas of concerns that have been observed during the visit is [Mother] having a challenging time managing all three children during structured meal time and play in the large play area. FNC has assisted

14

and coached [Mother] multiple times during their meal time. [D.M.] frequently attempts to run out of the visitation space, kitchen area, and large play area. [Mother] will tell [D.M.] to stay in the space when he tries to leave however the facilitator consistently models blocking the exit so [D.M] is not able to leave. With coaching and prompting from the facilitator [Mother] has been able to retrieve him[.] [A]t time when he does make it how however [sic] generally the retrieval of [D.M.] is managed by a facilitator.

The children's ages at the time the email was written were 26 months, 16 months, and five months. Again, besides being a dated, this observation is not particularly revealing. It does not support the magistrate's finding that Mother "struggled" outside of circumstances in which it is normal to struggle, as organizing mealtime with three young children is simply difficult for anyone. In fact, the email shows that Mother put into practice parenting coaching tips during visitation with the children, and generally got things under control.

{¶42} "[A] motion for permanent custody must allege grounds that currently exist." *In re C.W.*, 104 Ohio St.3d 163, 167, 818 N.E.2d 1176 (2004), citing *In Re K.G.*, 9th Dist. Wayne No. 03CA0066, 2004-Ohio-1421, ¶ 13. HCJFS's evidence that Mother struggled to manage her three young children was from at least seven months prior to the filing of the motion. The evidence was outdated and unconnected to the reasons L.M. was removed. At the time the motion was filed, L.M. was older and did not need the care associated with a newborn, which was a major concern at the time of her placement into temporary custody. HCJFS simply did not submit evidence to support the conclusion that Mother could not provide care to a toddler.

**{¶43}** Based on this record, at the time the agency moved for permanent custody of L.M. in May of 2017, Mother had nearly completed her case plan for the return of D.M. and L.W. She completed a diagnostic assessment, was engaged in individual therapy, completed required parenting education and received proof of completion, participated in random drug screens and consistently tested negative, and, according the HCJFS case manager, regularly visited with her children. Thus, HCJFS's allegations that Mother failed to remedy the problems that caused removal—an allegation that was based on the progress of her case plan for the return of D.M. and L.W.—is not supported by the record.

*Stable Housing and Income*

**{¶44}** Mother's housing and income were also noted in the initial removal order as issues of concern. However, when this case began, Mother was a minor and necessarily relied on her mother for housing and income. Mother cannot be condemned for not having reached the age of majority until more than a year into this case. Mother is now and was at the time of the permanent placement hearing a mature adult. She did what she was required to do by the agency for the return of her other two children, which served as the basis for the removal of L.M.

**{¶45}** The magistrate's decision even states:

[Mother] is now 20 years old. She dropped out of high school but has obtained her GED. She currently works 2 jobs and shares housing with her mother and sisters. She has had some training in nursing and desires to be a midwife. There is no doubt that [Mother] has matured in the many years since this case has been pending. She is making great strides in her life and should be proud of herself.

16

The magistrate and ultimately the juvenile court caveated this praise by finding it "very recent"—i.e., too little too late—but we disagree, especially where Mother satisfied a majority of her case-plan requirements before HCJFS moved for permanent custody.

{¶46} Accordingly, our review of the record fails to reveal clear and convincing evidence to support the juvenile court's findings with regard to the first prong of the test that L.M. cannot or should not be placed with Mother based on a consideration of the factors enunciated under R.C. 2151.414(E)(1). This court does not reach the best-interest prong of the permanent-custody test with regards to L.M., but we must continue our analysis for D.M. and L.W.

## 2. Second prong—R.C. 2151.414(D)(1)

{¶47} Under the second prong, the juvenile court must determine whether granting permanent custody to the agency is in the best interest of the children. *See* R.C. 2151.414(B)(1). "Unlike factual first-prong permanent custody grounds that can be established at a finite point in time, the child's best interest is a fluid concept, as it involves the child's continually-changing need for appropriate care." (Internal citation omitted.) *In re G.L.S.*, 9th Dist. Summit No. 28874, 2018-Ohio-1606, ¶ 16. Pursuant to R.C. 2151.414(D)(1), the court may find that permanent custody is in the best interest of a child upon consideration of all relevant factors, including,

(a) the child's relationships with the parents, siblings, foster caregivers, and any other person who may significantly affect the child,

(b) the wishes of the child, with consideration granted for their maturity,

17

(c) the custodial history of the child, including whether the child has been in the custody of a public child services agency for 12 or more months in a consecutive 22-month period,

(d) the child's need for a legally secure permanent placement, and

(e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

No single factor is given greater weight or heightened significance. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

**Best Interest**

{¶48} As for what would be in the children's best interest, the juvenile court again focused on visitation and the alleged incompleteness of the case plan, with an almost token consideration of the statutory factors.

{¶49} We do not mean to minimize the juvenile court's concern about Mother's ability to parent her children. However, the Ohio Supreme Court has long held that "parents who are suitable persons have a 'paramount' right to the custody of their minor children," *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977), and courts have described permanent termination of parental rights as "the family law equivalent of the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991); *see In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829. The fundamental interest of parents is not absolute, but "the termination of parental rights should be an alternative of 'last resort.' " *In re D.A.* at ¶ 10, quoting *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979). The evidence adduced at the trial in this case does not clearly and convincingly demonstrate that permanent custody is the *only* means by which to provide a legally

18

secure permanent placement for these children, and thus termination of Mother's parental rights was not in their best interest.

{¶50} From the onset of this case, HCJFS was concerned with dependency, *see* R.C. 2151.04—i.e., whether the children had adequate parental care as the children were born to child-parents. The record is devoid of any evidence of abuse or neglect, even for Mother's eldest child, D.M., who was in her custody until after his first birthday, while her other two children were removed straight from the hospital. To that end, HCJFS originally filed a case plan for the return of Mother's children that focused on addressing concerns over Mother's possible limited cognitive functioning and substance abuse. These issues were ultimately unfounded or deemed cured—Mother did not have cognitive delays but was simply immature, and Mother stopped using marijuana. Moreover, as discussed above, Mother completed the otherwise-required aspects of the case plan. Nevertheless, the juvenile court terminated her parental rights.

{¶51} The juvenile court found that R.C. 2151.414(D)(1)(a) was satisfied, explaining that the children have had only one foster placement for nearly four years to which they are bonded. However, the record is clear that the children are bonded with both their foster family and Mother. And, the case extended to four years through no fault of Mother's. For instance, Mother was a minor and thus could not have independently demonstrated stable housing and income until reaching the age of majority, Father requested numerous continuances, and the juvenile court erred in denying Mother a continuance to attend and testify at the first trial setting, which required a time-consuming appeal that ultimately led to a reversal and remand.

{¶52} In support of its finding that R.C. 2151.414(D)(1)(b) was satisfied, the juvenile court cited the GAL's belief that permanent custody was in the best interest

of the children. While subsection (b) addresses the wishes of the child, not the GAL, *see In re M.U.*, 1st Dist. Hamilton Nos. C-130809 and C-130827, 2014-Ohio-1640, ¶ 15, the GAL noted that the children are too young to express their wishes.

{¶53} The juvenile court found that R.C. 2151.414(D)(1)(c) was satisfied by the 12-of-22 condition as to D.M. and L.W. The record supports this finding—D.M. and L.W. were placed in temporary custody on September 10, 2015, adjudicated dependent January 12, 2016, and HCJFS filed its motion for permanent custody on May 4, 2017.

{¶54} In support of the finding that R.C. 2151.414(D)(1)(d) was satisfied, the juvenile court explained that

> [t]he children cannot achieve permanent placement without a grant of permanent custody to HCJFS. The parents have failed to maintain contact with HCJFS and other service providers, they have not completed all case plan services, and they did not visit the children regularly. The parents have had almost four years to complete case plan services and have not done so. The children are bonded to the foster family. The foster family desires to adopt. HCJFS knows of no impediment to the foster family adopting the children.

As described earlier, the evidence did not support the conclusion that Mother did not complete her case plan. Moreover, as relevant to a legally secure placement, an Interstate Compact for the Placement of Children ("ICPC") was never completed by HCJFS, when the agency had agreed to submit an ICPC report to the juvenile court at trial. Mother testified that neither HCJFS nor the guardian ad litem came to her home in Kentucky. This is despite the fact that the determination on permanent custody had been reversed by this court in March and that Mother provided her new

address to HCJFS through her attorney in May. How could the juvenile court make a determination on whether the children had a legally secure permanent placement if HCJFS did not investigate the placement and prove that it was insufficient? After all, the state had the burden of proof. *See Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). While "a legally secure permanent placement is more than a house with four walls," *In re P.,* 1st Dist. Hamilton No. C-190309, 2019-Ohio-3637, ¶ 42, surely the term "placement" must still require looking at the literal place where a child would live.

{¶55} More importantly, a legally secure placement also "generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *See id.* HCJFS has not demonstrated that Mother cannot provide that. Rather, the juvenile court found that Mother is now a mature adult with stable employment and stable housing. Having aged out of infancy and toddlerhood, the children are also more mature. There was never a concern for abuse or neglect of these children. And, none of Mother's children have special needs or specific care that the agency demonstrated Mother could not provide. Furthermore, the evidence demonstrated that Mother completed the case plan—"the primary reunification tool of children services agencies as contemplated by Chapter 2151." *See In re S.D-M.*, 9th Dist. Summit No. 27148, 2014-Ohio-1501, at ¶ 29.

{¶56} Under the circumstances presented in this case, we cannot conclude that HCJFS demonstrated by clear and convincing evidence that the termination of Mother's parental rights was warranted. Consequently, we conclude that the trial court erred in terminating Mother's parental rights and in placing D.M., L.W., and

21

L.M. in the permanent custody of HCJFS. Mother's sole assignment of error is sustained.

## Conclusion

{¶57} The judgment of the Hamilton County Juvenile Court is reversed, and the cause is remanded for further proceedings consistent with this opinion. We note that Mother's parental rights were wrongfully terminated and Mother has gone without seeing her children for nearly two years, and therefore encourage the juvenile court to act expeditiously in carrying this judgment into execution.

Judgment reversed and cause remanded.

**BERGERON** and **CROUSE, JJ.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.