[Cite as *In re N.M.*, 2021-Ohio-4275.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: THE C, S, AND M CHILDREN | : | APPEAL NO. C-210215 |
| | | TRIAL NO. F06-267Z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 8, 2021

*Cynthia S. Daugherty*, for Appellant Mother,

*Raymond T. Faller*, Hamilton County Public Defender, and *Robert Adam Hardin*, Assistant Public Defender, Guardian Ad Litem for N.M, E.M., D.S., and B.C.,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Silvia Ariera*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**ZAYAS, Presiding Judge.**

{¶1}   Mother appeals the decision of the Hamilton County Juvenile Court granting permanent custody of her children N.M., E.M., D.S., and B.C. to the Hamilton County Department of Job and Family Services ("HCJFS").   For the reasons discussed below, we affirm the juvenile court's judgment.

## Background and Procedural History

{¶2}   This case has an extensive history and concerns custody of four children: N.M., E.M., D.S., and B.C.   Interim custody of N.M., E.M., and B.C. was granted to HCJFS on July 7, 2017.   On October 30, 2017, N.M. and E.M were adjudicated dependent, and D.S. was adjudicated dependent and abused. Temporary custody of N.M., E.M., and D.S. was granted to HCJFS on March 20, 2018, and extended on June 12, 2018.

{¶3}   Interim custody of B.C., who was born in May of 2018, was granted to HCJFS on June 4, 2018.   B.C. was adjudicated dependent and abused on July 12, 2018, and temporary custody of B.C. was granted to HCJFS on September 6, 2018.

{¶4}   HCJFS filed a motion to modify temporary custody of all four children to permanent custody on December 6, 2018.   The hearing was held over seven separate days:  September 12, 2019, October 22, 2019, October 23, 2019, December 2, 2019, January 16, 2020, March 6, 2020, and July 23, 2020.

### September 12, 2019 Hearing

*Testimony of Jeremy Page*

{¶5}   Jeremy Page is a caseworker for HCJFS.   He testified that the case-plan goals for mother included: (1) obtain and maintain stable housing, (2) obtain and maintain stable employment, (3) visitation with her children that she is allowed visitation with, (4) participation in random drug screens, which included urine and

hair follicles, (5) participation in mental-health treatment through Greater Cincinnati Behavioral Health ("GCB"), and (6) participation in parenting classes through Family Nurturing Center ("FNC").

{¶6} Mother completed parenting classes through FNC in August or September of 2019. The referral for the classes was sent out in January of 2019. The purpose of the classes was to help increase mother's protective capacities towards her children and to increase the parent/child interaction between her and the children.

{¶7} Mother completed a mental-health diagnostic assessment. Page testified, "And with that assessment, she was recommended for mental health treatment but had reported that she had already been engaged with GCB for a number of years, that she has been connected with a case manager and a therapist, and she wanted to maintain her services there." Page was unable to speak with GCB, despite "calling heavy" to get in contact with them. When he left them voicemails, he never received a call back. He asked mother to reach out to them to let them know he was trying to contact them, but GCB never got back with him. Mother did sign a release of information for HCJFS. He was unaware if mother also signed a release for GCB but was told by an operator at GCB that they could not release any information without a signed release on their end. Mother did bring a letter to court once that stated she was engaged in therapy, but HCJFS was never able to confirm what she was working on. Mother told him that she would get the records, but when he would ask mother about the records, she continually indicated that she was following up with her case manager.

{¶8} Mother was not compliant with drug screens. Mother would participate in urine screens and started out doing "hair follicles," but began refusing

to do hair-follicle tests altogether in early 2019. Mother gave two reasons for her refusal: (1) it was impacting the stability of her mental health, and she was going to get a letter from her therapist recommending not to do hair-follicle tests, and (2) she indicated the screens would be positive for marijuana because she had a medical marijuana card. Mother admitted to marijuana use. Page testified that mother never showed him her medical marijuana card or a prescription or "anything in regards [sic] to it being medically recommended to use marijuana." She never told him what condition she had that the medical marijuana card was used for. There was also a concern for oxycodone since B.C. was born positive for oxycodone in his system in May of 2018. B.C. went through withdrawal symptoms from being born positive.

{¶9} To his knowledge, mother had stable employment at the time of the hearing. She reported working at IHOP since L.C. was born.[1] Page never confirmed that mother was working there, but he believed that mother was working there. Prior to that, she was working security at Sam's Club and a couple of "odd-and-end jobs." He testified that mother's work history was inconsistent and that she changed jobs a lot. Mother reported "at least three" different jobs since he had case responsibility. He never saw a pay stub from any of the jobs.

{¶10} Mother did not provide any proof that she obtained stable housing. She previously indicated that she was staying at a weekly motel but did not communicate the address of the hotel to HCJFS. Page testified that a parent living in a hotel is not a concern to him, "if they are able to maintain the stability of it." Mother has a history of unstable housing and has reported "more than five" houses or placements since he had case responsibility.

---

[1] L.C. is mother's youngest child that is not the subject of this appeal.

4

**{¶11}** Mother's visitation was stopped in August of 2018 and was reinstated in early 2019. Mother only had visitation with B.C. and D.S. Visitations were stopped for E.M. and N.M. after they disclosed to their therapist that they were sexually abused by their mother's, at the time, boyfriend's father.

**{¶12}** Page testified that he did not feel that mother could be reinstated with the children at the time of the hearing. He said:

> The concerns that the agency currently has is that mother has not obtained nor provided any proof of stable housing at this time. She also is still in communication with [boyfriend], who she indicated she's had a domestically violent relationship with in the past. She's also indicated that he's currently domestically violent with his wife. Mother struggles to understand the concerns that the agency has for the safety of the children. And we just don't believe it would be in their best interest to reunify at this time.

**{¶13}** He testified that mother indicated there was abuse to D.S. Specifically, D.S. was thrown in a car seat against the wall during an altercation between mother and boyfriend. Mother was referred for a domestic-violence assessment with the YWCA, but no services were recommended. Page agreed that he would consider this a completed assessment. Mother was still in communication with boyfriend at the time of the hearing.

October 22 and 23, 2019 Hearings

*Testimony of Maternal Grandmother*

**{¶14}** Maternal grandmother testified that mother was staying in a very nice motel on Chester Road, and testified that, for the last three months, mother had stable and paid housing. Mother also stays with grandmother at her house a few

times a week or on the weekends. When asked if she was aware that mother "knew about the rape that was occurring in her home," grandmother replied, "I had -- somebody had told me that, but I was not told that directly." When asked if E.M. and N.M. stopped visitation with mother because mother knew about the rape, she responded:

> The reason I was told that they didn't want to visit was because they were afraid to come down here because of how close [boyfriend's father] and [boyfriend] are to the area that they would be in. They were afraid of those two people. They are not afraid of their mother. They love their mother. But there's different things being done. I mean, [boyfriend's father] is not proper for anybody. And because of that, he put the fear of, I will kill you if you tell somebody. And that's a lot of the reasons why they want to be up there away from here. They needed to feel safe. And it wasn't that it wasn't safe, it was too close.

{¶15} Boyfriend's father lived with mother and boyfriend in 2017. Boyfriend's father was "charged with several things involving minors." The rapes of E.M. and N.M. were reported in August of 2018. Grandmother testified, "I was told that -- the storms that were going through upper Ohio and through here, the lights went out, and [E.M.] got afraid and was screaming, turn the light on, bad things happen in the dark. And that's when everything started to bubble out."

{¶16} When asked if she had any concerns about mother's ability to parent, grandmother responded, "Yes. She has to let us help her a little more, be able to not shoulder everything herself, let us help as a family working together for the children."

*Testimony of D.D.*

{¶17} D.D. has legal custody of mother's youngest child, L.C. She went to grade school with Mother. She also had custody of S.M. at one point.[2] D.D. supervised some of the visits with mother and the children, but never with E.M. or N.M. E.M. and N.M. reported to her that they did not want to visit with mother. D.D. testified that there were "issues" with the visits. At a visit in May of 2018, D.S. ran off and another supervisor had to go chase her down. D.D. felt this was mother's responsibility to make sure that she knew where the children were and, at the time, she did not. When discussing a visit in August of 2018, she stated that S.M. ran into the room crying, and told her that mother had called her, N.M. and E.M. "curse words." She also testified that D.S. and B.C. would cry and want to be with their foster mother during the visits. At a visit in July or August of 2019, mother brought marijuana in a cigarette pack.

{¶18} D.D. did not feel that mother could "handle" the children and their needs "without help" if they were returned to her. She testified, "I know she is working, but I also know that she doesn't make enough money to take care of herself and four children, so she would probably need some government assistance, which I mean, that's acceptable." She also felt mother would need support from her family and friends because, "[t]he younger children are not able to self protect [sic]."

{¶19} Mother reported arguing and fighting with boyfriend consistently to D.D. until about six months ago. D.D. stated, "It was physical for some of the time." When asked what she meant by physical, she responded, "Pushing. I don't think there was ever any hitting discussed." She testified that mother reported being

---

[2] S.M. is mother's oldest child that is not the subject of this appeal.

pushed by boyfriend and his wife. She stated, "[Boyfriend] was pushing to separate them, and [boyfriend's wife] was assaulting [mother]." All three were living together for about four to six months. As far as she was aware, mother had not been involved with him for about six weeks. Her knowledge was based on screenshots of text messages sent to her by mother and boyfriend. Mother was with boyfriend for about four years, on and off.

{¶20} D.D. testified that mother smoked marijuana daily, and that she saw a "digital copy" of mother's medical marijuana card. She also testified that mother reported to her that she was finally able to get her prescription to go with her medical marijuana card, but she never saw the prescription. She stated, "And then I also know that [mother] drank from a cup that had oxycodone in it before [B.C.] was born. * * * She said she had just picked up a cup thinking that it was hers because all the cups were the red solo cups." This happened at a cookout on Memorial Day. Mother never reported any cocaine use to her. D.D. agreed that her testimony was not that mother was "actively using any drugs that she didn't have a prescription for or [that] wasn't an accident."

{¶21} In the past two years, mother reported to D.D. that she did not have a place to stay or was "couch surfing," for all the time except for the past three months. D.D. stated, "She had to sleep outside and in her car on three occasions, but most of the time she could stay at her friend's house."

*Testimony of Robin Mulcahy*

{¶22} Robin Mulcahy does parenting services through FNC. She was mother's parenting coach. Mother came in for a parenting assessment in March of 2019. They determined that mother would benefit the most from their nurturing, parenting, and education curriculum, which is a one-on-one class. Mother

8

participated in the class. Mother completed the assessment in April 2019 and parenting meetings began in May 2019. She completed the classes in early September of 2019. There were approximately 14 sessions in total. Mother attended and was on time, with minimal cancellations, and participated throughout services. One of the topics of preventative parentings was domestic violence and "just discussing healthy and unhealthy relationships." Mother alluded to unhealthy relationships in the past during these discussions. They also discussed "how drug use could impact parenting and good judgment and protective capacities in parenting." She did not recall mother ever telling her about marijuana use. When asked if she would find that concerning, she responded, "Yes. If she had told me that, we would have discussed that specifically."

{¶23} They took an education-based approach with mother because the children were not involved and she "was not able to see hands-on parenting skills." Mulcahy never observed mother with the children involved in this case but did observe her with her oldest and youngest child, who each attended one appointment. She did not believe that mother had visitation with any of the other children at the time of services. She did not observe any issues while mother was parenting the children. She did not recall witnessing anything concerning during the sessions. She observed that mother and S.M. had open communication. She stated, "They were cordial and friendly and joked with each other, and appeared to have fun." She witnessed mother feed, burp and change L.C.'s diaper.

{¶24} She testified that mother "changed housing early in our assessment process, and she placed her services on hold before we actually began individual meetings to obtain housing. And then she was seeking housing at the end of our term of coaching as well."

9

*Testimony of P.R.*

{¶25} The children were placed with P.R. at the time of the hearing. D.S. came to her in April of 2018. B.C. came at the beginning of June 2018. E.M. and N.M. came in the middle of June of 2018. When B.C. first came to her, he was screaming and crying all the time. Then he started shaking so they went to the doctor. D.S. was 14 months old when she came to her, and she was not speaking. She started intervention services for speech and was speaking at least 20 words within four months. She testified that the children were all doing great.

*Testimony of Orlando Ramirez*

{¶26} Orlando Ramirez is employed with GCB as a caseworker/case manager. He is mother's case manager. A case manager helps to facilitate recovery "from any mental health issues she may have." At the time of his testimony, he had known Mother for a couple of months. Mother's previous caseworker retired. He met with her "three to four times in a couple months, which is pretty average." He testified, "She never called off any meetings with me. She engages pretty frequently." He did not remember what her diagnoses were.

{¶27} During their sessions, they talked about her goals for the coming year. Mother's goals were related to maintaining her benefits, getting her children back, housing, and income. These goals were set by mother "a couple weeks ago." Ramirez testified that he was not a therapist and did not do therapy with mother. When asked if mother attended therapy, he responded, "I believe she used to attend therapy, but the sessions are only 12-week periods and then they stop. If you want more therapy sessions, you go for it." Ramirez did not have the capability to prescribe medication to mother. He did not know when mother last engaged in

therapy and could not remember if mother was currently on medication through GCB.

{¶28} Regarding mother's goal to get her children back, Ramirez testified that the goal allowed him to help keep mother "on track." This included encouragement and talking to her about what she might be feeling. Regarding the housing goal, the HomeLink program is a subsection of GCB that focuses specifically on housing. He stated, "I believe we filled out an application, but it takes time for that to process, some time ago." The housing goal also allowed him to "help her look for housing in certain areas, come up with ways, you know, to save money, all that stuff." He testified, "But she's pretty on top of that mostly for herself."

{¶29} According to Ramirez, mother was working at least two jobs, maybe three. When asked how he knew about mother's jobs, he testified, "She's talked about it." He never asked for pay stubs. He testified that mother also reported that she was currently living in a hotel. He stated, "I know she's been looking for housing, looking for affordable places that she can stay with her kids." Mother was compliant with everything he asked her to do. When asked if he had any reason to believe that mother would not continue to be compliant with services, he responded, "No. There's no reason at all, until she, herself, determines that she doesn't feel like she needs services anymore." He has met with mother in the community and at GCB. He also met with her at a hotel, but not the hotel where mother was staying at the time of the hearing. He had not seen the hotel where mother was staying at the time of the hearing.

*Testimony of Mother*

{¶30} Mother testified that this case began, "[b]ecause there was a complaint made that I was using drugs, and there was [sic] issues in the home, and there had

11

been problems between me and my now ex." Her "ex" is boyfriend. When asked if she had contact with him anymore, mother responded, "No. And I've been telling him the last couple months to go away, go be with his wife, leave me be. He's created enough problems for me and my family." They broke up the night L.C. was born. She testified, "[H]e decided to show up drunk to our son's birth, and then decided that it was more important to beat the crap [sic] out of somebody who was protecting his other children. When that came to light is when I decided that he no longer needed to be a part of mine or my children's life, period, point blank." This happened about four months prior to the hearing in June of 2019. The last communication she had with him was "about six weeks ago." Any communication she had with him since the breakup was to tell him to "go away."

{¶31} HCJFS asked mother to complete a mental-health assessment, provide proof that she is working with GCB, complete drug screens, and participate in therapy. She testified that she has consistently provided proof that she is working with GCB, completed drug screens, and participated in therapy twice. HCJFS later asked her to complete a domestic-violence assessment. She testified that income was never a question because she has always held a job. She admitted that she has been struggling with housing on and off for the last two years. She completed one mental-health assessment in September of 2017 and one in September of 2018. She testified that her diagnoses were, "Depression in three forms, PTSD, cannabis use, they had me listed as one of the things, and I'm not quite sure – I can't remember. I think it was generalized anxiety with panic disorder was the last, if I'm not mistaken." The recommendation was therapy. Mother testified that she has been "going" to GCB since 2006, when she was 17 years old. When asked about housing, mother said,

"Well, the last two years, I've been from place to place, either staying with friends or occasionally someone that I was with at some point."

{¶32} At the time of the hearing, mother was living at the Hometown Studios hotel in Sharonville on Chester Road. She testified, "This is the third hotel that I've been at and progressively getting better with each one that I've gone to." The first one was Gateway. Then it was the Travel Inn. Her goal was to get a home of her own. She testified that, at one point, she almost had housing with the Cincinnati Metropolitan Housing Authority ("CMHA") but "because I did not have my children's Social Security numbers given to me in a reasonable amount of time [by "children's services"], my application was overlooked." When asked about HomeLink, she stated, "I'm actually pushing a third application through them because of the unfortunality [sic] of losing Drew, my previous HomeLink worker, from him quitting."

{¶33} When asked if she completed drug screens, Mother testified, "Over the last two years, I want to say maybe 20, maybe. And that's a rough estimate over the last two years, and there have been several that I have submitted hair." She testified that her PTSD made it hard for her to give a hair sample because, "I hear my hair being cut and I want to puke. My nerves go all a wrack [sic] and I start having flashbacks, and it's not comfortable." Mother admitted she missed a few drugs tests, "either due to work or short notice and not having transportation."

{¶34} Mother got a "medicinal card" from Green Relief. She testified that this helps her with muscle spasms in her back and legs, her appetite, nausea, and pain control from a spinal injury she had a few years ago. She also testified, "It helps with my PTSD with the flashbacks, the emotions that come with it, in stabilizing me and helping me to remember that I'm not there, I'm here now." When asked about

"grabbing the wrong cup," mother responded, "I didn't mean to do that shit. I didn't mean to grab the wrong cup. I wasn't trying to hurt my kid. Mistakes happen."

{¶35} When asked if she was in therapy, mother responded, "No. Unfortunately, my last therapist had left GCB the week after [L.C.] had been born." She was in therapy from April until June while she was pregnant with L.C. Mother agreed that she planned to get a new therapist. She testified that she completed a domestic-violence assessment, but was not required to do anything further after the assessment. Mother's hours at IHOP were "cut." She also worked for Upshift, which is "a service in which you can find either permanent work or temporary work for extra money."

{¶36} When asked about the visit where she "cussed" at the children, mother testified:

> The one that they were expressing, which is the one they came down for that someone was crying; I will say that I told her she was acting a Jack and an ass because she was being stuck up, she was being rude, she was being hateful to her sisters. And I told her I taught her better than that. And, yes, I know it probably hurt her feelings, but she was being hateful and rude to her sisters. And I told her she was acting a Jack and an ass.

> * * *

> I told [N.M.] she was being hard-headed and rude because of the factor she wasn't listening to Trish, she was giving her problems, bad mouthing her, fighting with her about doing things, wasn't picking up, wasn't listening, basic attitude of a child going into the teenage years.

14

* * *

I didn't think -- because of the factor I was telling her she was acting a Jack, referring to a mule, and being an ass, as in being arrogant and assuming and rude and hateful, I didn't think that it would be that big of an issue, because of the factor I was stating, you are acting this way. It wasn't outright saying that's what she is. And I figured it was the easier way. I wasn't cussing at them for real, I wasn't doing anything. I was trying to reiterate to them [N.M., E.M., and S.M.] they were taught better, they were raised better, and they need to act as such, because they weren't just representing themselves, they were representing me and how I raised them, and I know I taught them better.

* * *

[E.M.] was giving attitude and hissy-fitting and giving us regular problems. I addressed that. I was trying to be a parent in disciplining without physical need, but doing it through verbal recorrection [sic] like, look, this ain't [sic] right. You're not supposed to be doing this. You don't talk that way to an adult, you don't do these things. These are your sisters; you're supposed to be spending time with them, not your other friends. You see them all the time. You don't see your siblings as often as you should; reiterating that family is what is important, being respectful to adults, showing that you were taught to follow orders, things of that nature. It wasn't anything to hurt them or make them feel less than what they are. And me and

15

[S.M.] have addressed that.  Me and [S.M.] have spoke [sic] about that, and that's been put in the past between us.

{¶37}  Mother testified that her visitation was stopped in September of 2018 "because of what had come to light that [boyfriend's father] had done to my children."  The visits did not start back until June of the next year.  Mother was told she had to complete parenting classes to restart visitation.

<u>December 2, 2019 Hearing</u>

*Testimony of Krystal Thomas*

{¶38}  Krystal Thomas was the caseworker assigned to the case in October of 2019.  Mother did not have a therapist at the time of the hearing.  When asked why mother was not in therapy, Thomas stated:

> She said she doesn't have enough time.  She feels that she's stable.  She says that she has her case manager, and she also has her doctor that uses [sic] for her marijuana card.  That's her primary doctor.  So she feels she can either [sic] talk to him about getting some services.  She can talk to her case manager about reaching out and getting services.  She said, with working and everything that she has going on, that she doesn't have time for therapy.

When asked why the agency wants mother in therapy, Thomas testified, "Mom has a lot of trauma, past trauma that she should be dealing with.  She has issues since the case has been opened that she's been dealing with as well."

{¶39}  Thomas had not yet asked mother to submit to a drug screen.  Mother did sign an updated release of information.  As the time of the hearing, mother was living with her mother.  She had been living there for about two weeks.  Thomas had

not been to the home. In the two months since Thomas had the case, mother reported three different living locations. Mother told Thomas she was working.

{¶40} She observed three to four visits with Mother since the last hearing in October. All the visits occurred at HCJFS. The visits were moved to HCJFS after Thomas received emails from mother and foster mother arguing over "who last went where." Thomas testified that B.C., "pretty much cries through the whole visit." Mother tries to calm him down by rocking him, walking him around and trying to play videos. D.S. cried a lot during the first two visits. Thomas did not witness any concerns with mother during the visits. Thomas told mother to complete orientation at FNC for visitation about three weeks prior to the hearing. She testified, "[Mother] didn't do it for like two weeks. But the last two weeks, she had been [sic] trying to do it."

*Testimony of Orlando Ramirez*

{¶41} Mother had a therapist assigned to her in the past at GCB but did not have a therapist assigned to her at the time of the hearing. When asked why, he responded, "She doesn't need a therapist currently." It is the client's choice to make. He stated, "She can come to me and would be very quickly [sic] to sort of get back into seeking therapy or psychiatry." Mother was trying to work with HomeLink to get housing. Care Management and HomeLink "would be the only service that [Mother] is receiving right now at GCB."

*Testimony of Mother*

{¶42} Medical marijuana is the only medicine Mother is currently taking. She has a prescription from Dr. Khan. She has been seeing him since September of 2019. She testified, "He becomes my full primary care doctor." She qualifies for this prescription due to spinal injury, chronic pain, anxiety, and PTSD. She testified that

17

she went to Dr. Kahn because, "I believe, holistically, that medical marijuana is a better option than taking pain medication, nerve pills." It was recommended that she use it in a "sparing amount."

**{¶43}** When asked why she was not in therapy, mother responded, "As of June of this year, my last therapist actually left GCB, and I have not been reassigned another one, and I have not asked for services otherwise because I have actually been able to keep myself calm." When asked if she would feel comfortable getting a therapist if something came up, she responded, "I've screamed it every time I've needed it, and that's been multiple times since 2004 when I came home." She had a therapist in 2008, 2013, 2015, and 2018. When asked how long she was working with a therapist from 2018 until today, she responded, "Almost both years. Almost the whole time."

**{¶44}** Mother agreed that she would complete a hair and urine drug screen if the HCJFS caseworker asked her to complete it. She asserted that it would only come back positive for marijuana. When asked why she had not wanted the hair-follicle test in the past, she stated, "Because of my anxiety, my PTSD, the sound of scissors wracked my nerves and throws me into an episode and makes me sick."

**{¶45}** She had four visits with the children since the last hearing. The visits went "progressively better." When asked about her plan for housing, she stated, "Right now, my goal is to get into a place of my own. That has been my goal." If the children were returned to her, they would all stay at grandmother's home.

**{¶46}** When asked about where she was working, she responded, "Right now I'm with Upshift, and they have me placed at Swim Outlet, which is a temp-to-hire job. After 400 hours of being with them, I can be brought on to work with them permanently, benefits and all." She started there last week. She testified, "I've been

there with them for two shifts, so I've done 16 hours with them this week alone." She was at Topics, another company through Upshift, the week before that. She stated, "But I chose not to stay because of the hours and the way that they work." She worked at Topics for three weeks. Upshift is a "permanent-to-hire agency," run through an app on her phone. She worked at Surgical Applied Industries through Upshift in September. This is when she started with Upshift. She worked at IHOP from July to October. Before that, she was not working because she was placed on bedrest in March while she was pregnant with L.C. Before that, she was at Agies Security Company shortly after Christmas of 2018 through March.

March 6, 2020 Hearing

*Testimony of Emily Maiorana*

{¶47} Emily Maiorana is a diagnostician at GCB. She completes the yearly mental-health assessments for all the clients on her team. She is a licensed independent social worker. The last mental-health assessment she completed with mother was in April of 2019. She testified, "For [mother], we recommended counseling services to work on coping skills for anxiety and depression. And I recommended that she continue to work with her care manager." Counseling services were suggested because mother said she wanted to work on her coping skills. Maiorana was unable to tell the court if mother had followed through with any of the recommendations. She testified that she would not know mother's attendance in the programs. She did not remember if mother had ever engaged in counseling.

*Testimony of Orlando Ramirez*

{¶48} Ramirez was working on getting mother back into counseling. He testified that mother wanted to go to counseling "due to something that occurred in the past that she wanted to talk about with the counselor." He said there was an

19

event that occurred "around the first of the year that made her sort of start experiencing some of her symptomology." He testified that tentative intake dates had been scheduled, but mother had not started the process. When asked what had prevented the process, he responded, "Well [mother] doesn't have easy access to a phone right now, which makes sort of coordinating things a little difficult." Additionally, he testified that most of the delay had been "on our end" getting the paperwork processed. He went to try to see mother on Monday or Tuesday at her home, but she wasn't there. Mother did contact him via email this past Sunday. When asked if mother had expressed any interest in any other programs, he responded, "I think in the past she had expressed an interest in the HomeLinks [sic] Program, that we had to find a more stable housing situation." When asked if he had any concerns with mother being compliant, he stated, "Only thing really would be that she doesn't have a cell phone now, which makes sort of coordinating difficult, but that's going to change soon, I hope."

*Testimony of Mother*

**{¶49}** At the time of the hearing, mother was living with her mother. She was added to the lease in December of 2019. She started working at Taco Bell in February. She worked there for four days but quit after a dispute with coworkers and managers. When asked why she had "spotty employment," mother testified:

Some of it has been physical limitation. * * * Some of it has been the factor [sic] that it's hard to find a job when you have so many court dates, so many other things that you have to balance and whatnot. And a lot of people are not willing to work with that. It is very difficult to try to get a job and tell them, oh, I have this court date I have this court date oh, I have to take this off because I have to go do

20

these assessments. Oh, I have to take these days off because I have to go do these. * * * A lot of places don't care if you have kids. They don't care if you have a life outside. They are there to have you work, get a paycheck, and go home.

Mother stopped working for Upshift in December. She worked at Upshift from September of 2019 to December of 2019.

{¶50} Mother was still working with her HomeLink worker, Shawna. When asked how long she had stable housing from June of 2017 until the present, mother responded that she had stable housing for a couple of months in 2019. Mother testified that she has participated in therapy "on and off" since 2018. The last time she had therapy was in June of 2019. Mother had custody of N.M. and E.M. when they were raped. She denied having any knowledge of the rapes occurring.

<u>July 23, 2020 Hearing</u>

{¶51} At the start of the hearing, mother's attorney told the court, "I don't want to throw my client under the bus, but I also want to protect myself. I've been trying to get ahold of her since June, early June, and haven't until about maybe two days ago." Mother was not present at the start of the hearing. The court made a note of the time being 1:11 p.m. when stating that mother was not there. Mother's counsel requested a continuance, but the continuance was denied due to the length of time the trial had already taken. Mother eventually arrived at 2:19 p.m.

*Testimony of Krystal Thomas*

{¶52} Mother had not submitted to a drug screen since the last hearing. A drug screen was set up for March 7th. Mother took the urine test, but not the hair-follicle test. The urine test came back positive for marijuana. Thomas testified:

21

So since then, I tried to set Mom up for a drug screen, I believe, about April the – around April 13th. * * * And I think I emailed her on the 12th to tell her to go on the 13th. At that time, I ended up getting a notification from our agency saying that her release of information was no good. We had just got recent R.O.I., and Mom checked the box that said no to the services. So I let Mom know that [sic] not to go to the drug screen, that I needed her to do a new R.O.I., which I sent it to her on the 15th of April. * * * And she said she would get it back to me. And even in July she is still saying she's going to get it back to me. I even tried to meet up with her as well, sent it to her twice. And I haven't been able to get a drug screen from her. I did let her know in several emails that I needed that drug screen, that release of information to be able to move forward doing drugs screens for her. I know she stated about dropping it off downtown two different times when I always asked to meet up with her, but in the emails, I let her know as well that I wasn't working from JFS, that I was working from home, and that she can either email it back over to me, fax it, or we can meet up. And I just got several messages about how busy she's been.

Thomas testified, "I know since I've had this case, I set her up for drug screens for urinary, hair follicles. She's only took [sic] one hair follicle, and that one she had marijuana, benzo, and cocaine. And when I've asked her to take other drugs screens for the hair follicle, she has not." Mother tested positive for cocaine in December of 2019. Mother denied using drugs, despite the positive drug screen.

{¶53} When asked how she tried to meet up with mother, she responded, "I emailed her, I called her, told her I would do a home visit. I told her, let me know

22

her schedule so we can try to work around her schedule, because she would always say how busy she was." She did that every month, at least once a month. Thomas testified that she had not "laid eyes" on mother since March.

{¶54} Mother did successfully complete parenting classes. After the visits started at HCJFS, FNC emailed her on October 31, and she let mother know that she needed to go to the FNC to complete orientation so the visits could continue there. Mother told her at weekly visits that she was going to complete the orientation. Thomas testified:

> It got to be around December. I was still doing visits at the agency. Mom told me that she had went [sic] to orientation several times. I contacted the FNC to ask if that was done and what was the holdup, and they told me that Mom had never even been to orientation. So I did file a case plan letting the Court know that I was stopping the visits until Mom did the orientation. So then I picked back up the visits in February [of 2020].

{¶55} Mother completed the orientation around January 23. Thomas testified, "So then right as she transitioned to the FNC, that's when the whole COVID 19 situation happened. So then we had to stop the visits because she was getting video calls and phone calls and things like that." Mother is attending the visits to her knowledge. She said, "Mom, she is late a lot. She has been late with me a few times. But overall, she – normally, she does show up to the visits." FNC has not reported any issues or concerns to her. Mother's visits are still only with D.S. and B.C.

{¶56} At the time of the hearing, mother was not engaged in therapy. When asked how she knew that, Thomas responded:

Well, she has a new case manager as of May 29th or May 30th of this year. She had only spoken to Mom one time. The new case manager set up appointments with Mom through like the one-call and a lot of phone messages. [Mother] set up about four different times to meet up, but she missed all the visits. I know [Mother] recently had let her case manager know that her phone was off. However, the case manager stated that [Mother]'s case would be closed, but it's not because [Mother] contacts the HomeLinks pretty often to try to get housing which [Mother] has mentioned to me that she has contacted them. I've asked [Mother] about her therapist and when was that starting. She would say that because of COVID, that she wasn't able to get that done. But from GCB, that's not correct. They don't even have her in there like she is even trying to start services. * * * And that they are doing them there on the site and during Telehealth, so there's really know [sic] reason why she hasn't started it.

Thomas testified that mother "just seems to have a lot of chaos going on in her life. She doesn't seem like she's stable. She is not getting her mental health services taken care of."

{¶57} Mother was supposed to be staying with her mother but "she's not there that often." Thomas verified that mother worked at Upshift October through December of 2019. Mother sent her a link in April of 2020, showing she was hired at KFC through Snag-A-Job. She worked at KFC from April through June of 2020, then she quit. Mother told Thomas she quit because she wanted more money. In April, the children were placed in respite care while P.R. and her husband figured out "some marital issues." They are now all together in another foster home. This foster

24

home did not intend to adopt the children if permanent custody was granted to HCJFS.

*Testimony of Maternal Grandmother*

**{¶58}** When asked if mother was living with her, grandmother responded, "not consistently." She testified that mother stays there "about a half a month" each month. She did not know where mother was staying the rest of the time

*Testimony of Mother*

**{¶59}** Mother claimed she was late to the hearing because she was "jumped this morning in Kentucky on my way here." When discussing the release of information, mother stated, "I hadn't had a chance to sign it because I had [sic] been busy with work and working out and trying to find a place to live and dealing with life and trying to balance everything out like I've been trying to do." She testified, "I plan on signing the paperwork here today after court." When asked if she was currently engaged in therapy, Mother testified, "I'm working with GCB, Miss Carol, who is my new worker because Mr. Orlando is no longer w [sic] GCB. She's getting me in so I can get to my therapy and deal with what I need to do [sic] with."

**{¶60}** Mother testified that she was still living with her mother. She claimed that she stays there the "whole time other than when I'm out. If I go out to stay at a friend's house or if I'm housesitting like I did the last few weeks." She testified that she was waiting to hear from Amazon "on a contingent offer." She quit working at KFC because "[t]hey weren't paying me correctly. They were either shorting my hours or they were not sending the paycheck to the correct destination." She testified that she also worked for a construction company doing cleanup from August to November of 2019. In person visits just started back at FNC after the break due to

COVID. She testified that she never got corrected by the facilitator for any of her parenting skills.

{¶61} When asked about the positive drug test for "cocaine and benzos," she responded, "The cocaine had been from a hair test from my surgery in July, and this was already discussed. This was already handled." She continued, "So again, like I said, the benzo and the cocaine was [sic] from a medical reason. It was from a surgery, and the benzo had been from a panic attack that I had addressed in the hospital." She opined:

> It was a medical reason so it is not countable because they had to use a different form of steroid from my breathing when I had tube removal in July of 2019. It was stated in my medical records, and it was testified to and they know about it. So, again, no. That is a false positive, and it is being used against me in an incriminating way and I don't appreciate it.

### *Relevant Exhibits*

{¶62} Receipts from the Travel Inn were entered as an exhibit and showed that mother stayed there for 33 days from September 9, 2019, to October 12, 2019. Another receipt shows that mother stayed at Homewood Suites from October 13, 2019, to October 19, 2019. A letter from Vinebrook Homes, dated December 12, 2019, was included as an exhibit that shows mother was added as an occupant to grandmother's lease.

{¶63} An "Ohio Medical Marijuana Registry" card was entered as an exhibit with mother's name on it. The card says it was issued on "09/30/2019" and expires on "09/30/20."

*Juvenile Court Decision*

**{¶64}** On September 1, 2020, the magistrate entered a decision granting permanent custody of N.M., E.M., D.S., and B.C. to HCJFS. On September 16, 2020, mother filed an objection to the magistrate's decision. On September 30, 2020, the juvenile court noted the objection was filed out of time but granted leave to file out of time. Due to COVID, the juvenile court did not schedule oral arguments on the objections but offered that the parties submit written arguments. All parties submitted written arguments to the court. On March 24, 2021, the juvenile court denied mother's objection to the magistrate's decision. First, the court found that all the children, except for B.C., had been in the temporary custody of HCJFS for more than 12 months, and found that B.C. could not and should not be placed with either parent, because (1) mother's unstable housing and income and her inability to address her substance abuse and mental-health problems indicated that B.C. cannot and should not be placed with mother, and (2) father filed a permanent surrender for B.C. and relinquished his parental rights. Next, the court found:

> M.M. [sic] has no interaction with Mother, and she had not lived with Mother since 2018. M.M. [sic] expressly stated that she did not want to live with or speak to Mother. She is currently living with a foster family with D.S.

> E.M. has no interaction with Mother, and she had not lived with Mother since 2018. E.M. expressly stated that she did not want to live with or speak to Mother. She is currently living with a foster family.

> D.S. currently has limited and supervised interaction with Mother. D.S. is too young to express her wishes; D.S. lives with a

27

foster family with M.M. [sic] and she has not lived with Mother since her removal in 2017. Although D.S. has no expressed wishes and D.S. interacts with Mother, D.S.'s custody has remained with a foster family and her removal was instigated by a domestic violence incident with [boyfriend]. Mother continued to live with [boyfriend] on and off after the incident. D.S. needs a legally secure placement and D.S' [sic] custodial history indicates that it is in her best interest to be placed in the permanent custody of HCJFS.

B.C. currently has limited and supervised interaction with Mother. B.C. is too young to express his wishes; B.C. lives with a foster family with M.M. [sic] and he has not lived with Mother since his birth. B.C. is too young to express his wishes and he does maintain some interaction with Mother. However, B.C.'s custodial history, particularly his removal at birth, and his need for a legally secure permanent placement that [sic] it is in his best interests to be placed in the permanent custody of HCJFS.

{¶65} Additionally, the trial court found that the state had shown by clear and convincing evidence that the children were in need of a legally secure placement that mother could not provide. The court stated:

Mother has failed to remedy the initial problems that caused removal and it is in the best interests of [the] children to be placed in permanent custody. Mother has exhibited multiple untreated mental health issues and this makes her unable to provide a stable home for her children. Mother has continuously failed to follow agency guidelines and she has failed to maintain a stable income and stable

housing. The State has also taken multiple measures to avoid permanent removal; however, Mother has continuously failed to be a part of those preventive measures.

{¶66} Accordingly, the juvenile court found that it was in the best interest of the children to be placed in the permanent custody of HCJFS.

{¶67} This appeal now follows. Mother raises a single assignment of error, arguing that the trial court erred as a matter of law by granting HCJFS's motion to modify temporary custody to permanent custody. In support of the assignment of error, mother asserts two issues for our review: (1) whether the trial court erred when it concluded by clear and convincing evidence that the children cannot be placed with mother within a reasonable time and should not be placed with mother when that decision lacked sufficient evidence and was against the weight of the evidence, and (2) whether the trial court erred when it concluded by clear and convincing evidence that permanent custody to HCJFS was in the best interest of the children when that decision lacked sufficient evidence and was against the weight of the evidence.

## Law and Analysis

{¶68} "A trial court's award of permanent custody must be supported by clear and convincing evidence, and we will not substitute our judgment for the trial court's when its decision is supported by competent, credible evidence." *In re C.L.*, 1st Dist. Hamilton No. C-170169, 2017-Ohio-7184, ¶ 17, citing *In re W.M.*, 1st Dist. Hamilton No. C-170003, 2017-Ohio-1398, ¶ 14. " 'Our review for sufficiency asks whether some evidence exists on each element. It is a test of adequacy, and whether the evidence is sufficient to sustain the judgment is a question of law.' " *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 21, quoting *In re A.B.*, 1st Dist.

29

Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. "Our review of the weight of the evidence 'asks whether the evidence on each element satisfies the burden of persuasion, which in this case was clear and convincing standard.' " *Id.*, quoting *In re A.B.*

{¶69} "R.C. 2151.414(B)(1) establishes a two-pronged test for courts to apply when determining whether to grant a motion for permanent custody to a public children services agency." *In re D.M.* at ¶ 23. "The statute requires the court to find, by clear and convincing evidence, that" (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) permanent custody is in the best interest of the child under R.C. 2151.414(D)(1)(a)-(e)." *Id.*, citing R.C. 2151.414(B)(1).

*First Prong - R.C. 2151.414(B)(1)(a)-(e)*

{¶70} "[A] child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the revised code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1). On October 30, 2017, N.M. and E.M. were adjudicated dependent, and D.S. was adjudicated dependent and abused. HCJFS filed a motion to modify temporary custody to permanent custody on December 6, 2018. The juvenile court determined, and the record confirms, that the first prong of the permanent-custody test was satisfied as to N.M., E.M., and D.S., because the children were in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d).

{¶71} As to B.C., the juvenile court found that he could not and should not be placed with mother under R.C. 2151.414(B)(1)(a). If the court determines, by clear and convincing evidence, that, "[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by

30

the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the child's home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home," then the court shall enter a finding that the child cannot be or should not be placed with the parent. R.C. 2151.414(E)(1).

{¶72} The juvenile court found that B.C. could not and should not be placed with mother because, "Mother's unstable housing and income and her inability to address her substance abuse and mental health problems indicate that B.C. cannot and should not be placed with Mother." The record reflects that, while mother did complete parenting class and was consistent with visitation, mother failed to keep consistent and stable housing and employment. Additionally, while mother did complete a mental-health assessment, she failed to stay consistent with the recommended therapy. Lastly, B.C. tested positive for oxycodone in his system at birth in 2018. Mother began refusing hair-follicle drugs screens in early 2019. When mother finally completed a hair-follicle drug screen in December of 2019, the test was positive for "cocaine and benzos." In 2020, mother again refused to complete hair-follicle drug screens and then failed to complete the needed release of information to continue drug testing. Therefore, clear and convincing evidence existed in the record to support the trial court's finding that B.C. could not and should not be placed with mother within a reasonable time.

*Second Prong - R.C. 2151.414(D)(1)*

{¶73} "Under the second prong, the juvenile court must determine whether granting permanent custody to the agency is in the best interest of the children." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, at ¶ 47, citing R.C. 2151.414(B)(1). In relevant part, R.C. 2151.414(D)(1) provides:

31

In determining the best interest of the child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No single factor is given greater weight or heightened significance." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, at ¶ 47, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶74} N.M., E.M., and D.S. had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. Additionally, B.C. had been in the temporary custody of HCJFS since shortly after birth. N.M. and E.M. had no interaction with mother and had expressed that they did not want to live with or speak with mother. D.S. and B.C. had limited interactions with mother during visits but were too young to express their wishes. B.C. was removed from mother's care shortly after birth after testing positive for oxycodone in 2018. Starting in 2019, mother frequently refused to complete hair-follicle drug screens. In December of 2019, she tested positive for "cocaine and benzos." After testing positive, she again refused hair-follicle drugs screens in 2020 and then failed to complete the needed release of information to continue drug testing. Mother also failed to follow through with the recommended mental-health therapy. This confirms that the children were in need of a legally secure placement that could not be achieved without a grant of permanent custody to HCJFS. Therefore, the record supports the juvenile court's finding that a grant of permanent custody was in the best interest of the children.

### Conclusion

{¶75} For the foregoing reasons, the juvenile court's award of permanent custody was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Accordingly, we overrule the assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.